**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LARRY ATKINSON, EUGENE WALKER, JASON GREENE, and GIOVANNI WILLIAMS individually and on behalf of others similarly situated,** | ) ) ) ) ) | **CASE NO. _____** |
| **Plaintiffs** | ) ) ) | |
| v. | ) ) | **DEMAND FOR JURY TRIAL** |
| **SUPER EGO HOLDING LLC; FLOYD, INC.; KORDUN EXPRESS INC; ROCKET EXPEDITING LLC; JORDAN HOLDINGS, INC; REX TRUCKING INC; and ALEKSANDAR MIMIC** | ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Larry Atkinson, Eugene Walker, Jason Greene, and Giovanni Williams bring this case individually and on behalf of all others similarly situated against Defendants Super Ego Holding LLC ("Super Ego Holding"), Floyd Inc., ("Floyd"), Kordun Express Inc. ("Kordun"), Rocket Expediting LLC ("Rocket"), Jordan Holdings, Inc., ("Jordan"), Rex Trucking Inc. ("Rex"); and Aleksandar Mimic ("Mimic") for breach of contract, fraud, conversion, civil conspiracy, violations of the Truth In Leasing Act ("TILA"), 49 U.S.C. § 14704(a)(2), violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/10a, and violations of the Illinois Wage Payment and Collections Act ("IWPCA"), 820 ILCS 115/9. Plaintiffs bring their claims as a putative class action pursuant to Fed. R. Civ. P. 23(b)(3).

**Introduction**

1.      Defendants are an affiliated group of transportation carriers, leasing companies, and holding companies that are owned and operated in common. Super Ego Holding maintains common ownership and control over all the other Defendants. Floyd, Kordun, Jordan, and Rocket are transportation carriers licensed with the DOT and Federal Motor Carrier Safety Administration ("FMCSA"). Rex leases equipment to the other affiliated entities and the drivers of those entities. Mimic is the president or manager for multiple Defendants. These Defendants have (1) comingled their businesses and operated interchangeably to illegally misuse their federal operating authorities; and (2) commonly shared drivers, dispatchers, and other staff, in contravention of the drivers' contracts, shipping documents, and federal regulations.

2.      Defendants conspired to engage in a widespread, longstanding scheme to defraud owner-operators/lessors with whom they contract to steal part of their compensation. Plaintiffs worked for Defendants as owner-operator/lessors, using trucks they leased to transport loads in interstate commerce. Defendants executed agreements with Plaintiffs to lease their equipment ("Lease Agreements") and pay them 88% of the rate of each load they transported for Defendants. Instead of paying the contractually promised amounts, Defendants wrongfully conspired to secretly alter the third-party brokers' load confirmation documents to reduce the actual rate (price) of each load, shared only the altered versions of the load confirmation documents with Plaintiffs, and then paid Plaintiffs only 88% percentage of the fraudulently reduced load rate. Defendants also breached their Lease Agreements with Plaintiffs and violated the ICFA and the IWPCA by engaging in this illegal practice.

3.      Additionally, Defendants violated Plaintiffs' rights under the Truth in Leasing Act ("TILA"), 49 U.S.C. § 14704(a)(2). TILA governs the terms and conditions under which owner-

operator truckers lease equipment to federally authorized motor carriers that transport freight in interstate commerce. *Id.* TILA regulations require the motor carrier's equipment lease to disclose all expenses that the carrier will "charge back to the operator" and all escrow payments that the owner-operator will make to the motor carrier. 49 C.F.R. § 376.12(h) & (k). The regulations also require the lease to disclose, in writing, the amount that the motor carrier will pay the owner-operator as compensation, and to abide by its lease agreement with the owner-operator. *Id.* § 376.12(d) & (intro paragraph).

4.     Defendants violated the TILA by not paying interest on their escrow deductions, not returning their escrow in full, overcharging Plaintiffs for fuel, and not paying owner-operators at the percentage rate promised in their equipment leases.

5.     On information and belief, Defendants' foregoing illegal practices are widespread and universally applied to each individual and business with whom Defendants have contracted to transport goods and services. Defendants have also executed substantively identical Lease Agreements with thousands of other individuals and businesses. Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals and businesses to seek monetary damages and declaratory, injunctive, and other equitable relief.

## Parties

6.     Plaintiff Larry Atkinson, a Georgia resident, is an interstate truck driver with seven years of experience in the transportation industry. He has a CDL Class A license and worked for Defendants, under their direction and control from December 2021 to June 2022 using equipment leased to him by Rex. The equipment was annually licensed and registered with the State of Illinois. During all times that Atkinson worked for the Defendants, he was not an agent of the Defendants for purposes of the TILA.

7.     Plaintiff Eugene Walker, a Georgia resident, is an interstate truck driver with over 35 years of experience in the transportation industry. He has a CDL Class A license and has worked for Defendants, under their direction and control, from July 2021 to August 2022, using equipment leased to him by Rex. The equipment was annually licensed and registered with the State of Illinois. During all times that Walker worked for the Defendants, he was not an agent of the Defendants for purposes of the TILA.

8.     Plaintiff Jason Greene, a Tennessee resident, is an interstate truck driver with 23 years of experience in the transportation industry. He has a CDL Class A license and worked for Defendants, under their direction and control, from December 2021 to March or April of 2022, and then again from June to July 2022, using equipment leased to him from Rex. The equipment is annually licensed and registered with the State of Illinois. During all times that Greene worked for the Defendants, he was not an agent of the Defendants for purposes of the TILA.

9.     Plaintiff Giovanni Williams is a Georgia resident. He worked for Defendants, under their direction and control, from July to October or November 2021. Williams contracted with another driver to use equipment leased to him by Rex to transport goods for Defendants. The equipment was annually licensed and registered with the State of Illinois. During all times that Williams worked for the Defendants, he was not an agent of the Defendants for purposes of the Truth in Leasing Act.

10.     Defendant Super Ego Holding is an Illinois limited liability company with a principal office located at 621 IL Route 83, Suite 240, Cook County, Bensenville, IL 60106. Super Ego Holding employs or contracts with drivers to transport its customers' freight in interstate commerce through its subsidiaries and affiliates. The manager and registered agent of Super Ego Holding is Aleksandar Mimic

11.     Defendant Floyd is an Illinois business corporation with a principal place of business in Cook County Illinois. Defendant Floyd is a federally regulated motor carrier engaged in providing transportationservices to the shipping public and is an "authorized carrier" within the meaning of 49 C.F.R. §376.2(a). The President and registered agent of Floyd is Aleksandar Mimic, with a registered address at 729 N. Rt. 83, Suite 324, Bensenville, IL 60106.

12.     Defendant Floyd employs or contracts with drivers to transport its customers' freight in interstate commerce. As part of its business, Floyd leases equipment from other related entities and owner-operators.

13.     Floyd is registered under Motor Carrier ("MC") number MC-977366 and US DOT # 2903977. According to the SAFER - FMCSA management information system, Floyd reported that it operated 19 power units (semi-trucks) and 19 drivers and ran approximately 9.731 million miles in 2020. Ex. A, Floyd Inc. Company Snapshot.

14.     Defendant Jordan is a corporation with an address at 1900 Polaris Parkway, Suite 450, Columbus, OH 43420. Jordan is a federally regulated motor carrier engaged in providing transportation services to the shipping public and is an "authorized carrier" within the meaning of 49 C.F.R. § 376.2(a).

15.     Jordan employs or contracts with drivers to transport its customers' freight in interstate commerce. As part of its business, Jordan leases equipment from other related entities and owner operators.

16.     Jordan is registered under MC-519274 and US DOT # 1351000. According to the SAFER – FMCSA management information system, Jordan reported that it operated 251 power units and 251 drivers. Jordan reportedly ran 100 miles in 2020. Ex. B, Jordan Holdings Inc. Company Snapshot.

17.     Defendant Kordun is an Illinois business corporation with a principal place of business in Cook County Illinois. Kordun is a federally regulated motor carrier engaged in providing transportation services to the shipping public and is an "authorized carrier" within the meaning of 49 C.F.R. §376.2(a). The President and registered agent of Kordun is Biljana Mimic, with a registered office at 765 N Route 83 Suite 115 Bensenville Il 60106.

18.     Defendant Kordun employs or contracts with drivers to transport its customers' freight in interstate commerce. As part of its business, Kordun leases equipment from other related entities or owner-operators.

19.     Kordun is registered under MC-594223 and US DOT # 1606904. According to the SAFER - FMCSA management information systems, Kordun reported that it operated 596 power units (semi-trucks) and 596 drivers. Further, Kordun reportedly ran approximately 13.76 million miles in 2020. Ex. C, Kordun Express Company Snapshot.

20.     Defendant Rocket is an Ohio limited liability company with an address at 1520 Old Henderson Rd., Suite 100B, Columbus, OH 43220. Defendant Rocket is a federally regulated motor carrier engaged in providing transportation services to the shipping public and is an "authorized carrier" within the meaning of 49 C.F.R. §376.2(a).

21.     Rocket contracts with drivers to transport its customers' freight in interstate commerce. As part of its business, Rocket leases equipment to or from other related entities and owner-operators.

22.     Rocket is registered under MC-807590 and US DOT # 2356464. According to the SAFER - FMCSA management information systems, Rocket reported that it operated 194 power units (semi-trucks) and 194 drivers, and reportedly ran 100,000 miles in 2020. Ex. D, Rocket Company Snapshot.

23.     Rex is an Illinois business corporation with a place of business at 205 W. Grand Avenue, Unit 123, Bensenville, DuPage County, IL 60106. Rex executed lease or lease-to-purchase contracts with Plaintiffs.

24.     Defendant Aleksandar Mimic is an individual with a registered office at 1517 N Dee Rd., Park Ridge, IL 60068. Mimic is registered agent for multiple Defendants and operates multiple of the Defendants as president or manager.

## Jurisdiction and Venue

25.     The Court has subject matter jurisdiction over this action pursuant to the TILA, 49 U.S.C. § 14704.

26.     The Court also has diversity jurisdiction over this action under 28 U.S.C. § 1332(a)(1), and jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d).

27.     Venue is proper in this jurisdiction under 18 U.S.C. § 1965(a) and 28 U.S.C. §1391(a), (b), and (c) because a substantial part of the events and omissions giving rise to this action occurred in the Northern District of Illinois.

## TILA Legal Standards

28.     TILA and its implementing regulations govern the terms and conditions under which owner-operator truckers lease equipment to federally authorized motor carriers that transport freight in interstate commerce. *See* 49 U.S.C. § 14102(a); 49 C.F.R. § 376.12. TILA regulations require the motor carrier's equipment lease to disclose, in writing, the amount that the motor carrier will pay the owner-operator as compensation. 49 C.F.R. § 376.12(d). The regulations also require that those leases disclose the details of any escrow withholdings and charge back items. *Id*. at § 376.12 (h), (k). When the lessor's revenue is based on a percentage of the gross revenue for a shipment, the lease must specify that the carrier will provide the lessor a copy of the rated freight bill, or any

other documentation used for a shipment containing the same information. *Id*. at 376.12(g). Finally, the regulations require the motor carrier to adhere to the terms of the lease. *Id.* § 376.12 (introductory paragraph).

## Common Facts

29.     Plaintiffs and other drivers worked for Defendants as owner-operators for purposes of the TILA regulations. 49 C.F.R. § 376.2. They transported goods for Defendants with those trucks by either driving the trucks themselves or contracting with another driver to drive the trucks.

30.     Plaintiffs each signed agreements with Rex to lease or lease-to-purchase trucks. The agreements with Rex provided that Plaintiffs would exclusively use those trucks to transport goods for Carrier Defendants. They could not use the trucks to drive for any other motor carriers.

31.     Plaintiffs then signed substantially identical Independent Contractor Agreements (hereinafter "Lease Agreements") with Rocket to "lease" the trucks to Rocket for the purpose of transporting goods. This was the lease required by 49 C.F.R. § 376.11.

32.     The Lease Agreements constitute "leases" under the TILA rules and are subject to their regulations. 49 C.F.R. § 376.2(e).

33.     Under the Lease Agreements, Rocket, as the authorized carrier, holds the federal motor carrier operating authority needed to provide services for the transport of non-exempt goods in interstate commerce. Plaintiffs leased their equipment (with or without drivers) to Rocket for the purpose of transporting goods through interstate commerce under Rocket's licenses and permits.

34.     Although Rocket is the entity listed on Plaintiffs' Lease Agreements, Carrier Defendants operated interchangeably, all under the control of Super Ego. Defendants instructed Plaintiffs to deliver freight for Carrier Defendants other than Rocket.

35.     Defendants instructed Plaintiffs Atkinson and Walker to deliver freight for Rocket, Floyd, and Kordun.

36.     Defendants instructed Plaintiff Greene to deliver freight for Rocket, Floyd, Kordun, and Jordan.

37.     Defendants instructed Plaintiff Williams to have the driver he hired to deliver freight for Rocket and Kordun.

### A.  Defendants Fraudulently Altered Load Confirmation Documents To Pay Plaintiffs Less Than The Rates Specified In Their Work Contracts.

38.     Plaintiffs each applied for jobs with Defendants by calling the number listed on a Super Ego job posting promising "88% of all loads." Job postings that are substantially similar to the postings Plaintiffs replied to are attached here as Exhibit E, at 1-2.

39.     Prior to executing contracts with Rocket, Plaintiffs each spoke with a recruiter for Defendants who promised they would pay Plaintiffs 88% of each load they hauled for Defendants.

40.     When Plaintiffs began working for Defendants, they traveled to Illinois to pick up their trucks and attend an orientation training about Defendants' company procedures.

41.     Rocket contracted with Plaintiffs and Class members through Lease Agreements substantially identical to the one attached here as Exhibit F.

42.     In the Lease Agreements, Rocket promised to pay Plaintiffs 88% rate of gross receipts for each load.

43.     The Lease Agreements all state, "CARRIER agrees to pay 88% of load pay offered…" Ex. F.

44.     Similarly, Plaintiffs signed lease to purchase agreements with Rex, substantially identical to the one attached here as Exhibit G, which state, "Lessee shall pay to Lessor 12%

commission on all loads as offered to Lessee under this agreement, and as a working contractor at Lessor's Motor Carrier. . ."

45.     Notwithstanding the fact that their Lease Agreements were with Rocket, Plaintiffs performed deliveries for multiple Carrier Defendants.

46.     Defendants lied and under-reported the load rate (or price) of Plaintiffs' loads in Plaintiffs' pay statements and in the load confirmation sheets they gave to Plaintiffs.

47.     When Defendants received a load confirmation sheet from a broker, Defendants electronically altered the document to lower the stated payment rate of the load and forwarded the fake load confirmation sheet to the driver. The altered documents were on the original third-party broker's letterhead. That way, the driver believed the load rate was less than it actually was.

48.     Defendants directly pocketed the portion of gross receipts they concealed from each driver and paid drivers' their promised portion of 88% on the lower, underreported amount.

49.     For example, Atkinson received a secretly altered load confirmation between Defendant Floyd and broker C.H. Robinson. The original load confirmation stated that the load rate was $4,800. Ex. H, Original and Fraudulent Load Confirmations, 2. However, Defendants sent Plaintiff Atkinson a fraudulent version of the C.H. Robinson load confirmation which stated that the rate for the shipment was only $3,500. *Id*. at 5. Defendants then paid Atkinson only 88% of the reduced load rate of $3,500.

50.     Atkinson also received a secretly altered load confirmation sheet between Defendant Rocket and broker C2 Freight Resources, Inc. The original load confirmation stated that the load rate was $2,700. Ex. I, 1. However, Defendants sent Atkinson a fraudulent version of the C2 Freight Resources Inc. load confirmation which stated that the load rate was only $2,000. *Id*. at 3.

51. Atkinson first discovered that Defendants altered the load confirmation documents in April or May of 2022 because he directly called the broker of a shipment and asked for a copy of the load confirmation sheet. When the broker sent him the original load confirmation, it listed a different load rate than the load confirmation he later received from Defendants.

52. Atkinson inquired about the discrepancy with one of Defendants' dispatchers who lied and said that the broker had made a "mistake" on the load rate.

53. Walker first discovered that Defendants were altering load confirmation documents in September 2021. Like Atkinson, Walker received an original load confirmation sheet from a broker, which listed a higher gross receipt than the fraudulent load confirmation sheet he received from Defendants for the same load.

54. Specifically, Walker received a fraudulent load confirmation sheet from Rocket stating that the total rate for a delivery was $1,700. Ex. J, 5. The original load confirmation sheet showed that the load rate was $2,050. *Id*. at 1. Rocket paid him on 88% of the $1,700 amount, rather than 88% of the actual load rate.

55. Walker inquired about the fraudulent load confirmation sheet with one of Defendants' dispatchers who denied that Defendants had altered their load confirmation sheets.

56. Greene received a fraudulent load confirmation sheet between Floyd and broker Nolan Transportation Group, LLC falsely stating that the total rate for the delivery was $1,500. Ex. K, 1. The original load confirmation sheet showed that the load rate was actually $2,150. *Id*. at 3. Floyd paid Greene 88% of the $1,500 amount, rather than 88% of the actual load rate.

57. Greene inquired with one of Defendants' dispatchers when he learned that Defendants were secretly altering load confirmation sheets. The dispatcher lied and said that Defendants had not altered any load confirmation sheets.

58.     Williams received a fraudulent load confirmation sheet between Kordun and the broker CAP Logistics falsely stating that the total rate for a delivery was $900. Ex. L, 1. While his driver was delivering the load, Williams learned from the broker that the actual load rate was $1,975. *Id.* at 3. Defendants also lied and told Williams that the rate for a load his driver transported from Los Angeles to Texas was $3,500. Williams later learned that Defendants were paid $5,000 for the load.

59.     Plaintiffs have called multiple brokers on over fifty loads, and on each occasion the broker has confirmed that the load rate reflected on the load confirmation sheet that the Defendants sent to the Plaintiffs were false. Defendants secretly reduced the rate on the third party brokers' load confirmation sheets to make Plaintiffs believe they were being paid correctly.

60.     Plaintiffs relied on Defendants' representations in the falsified load confirmation sheets believing that the falsified rates reflected the true amounts that brokers paid Defendants for the loads.

61.     Plaintiffs executed their Lease Agreements with Rocket on the belief that Rocket would pay them 88% of the actual rate that Rocket received for the loads.

62.     Rocket violated the TILA rules by not adhering to the terms of its lease agreement. 49 C.F.R. § 376.12 (intro paragraph).

63.     During the past five years alone, Defendants have collectively contracted with more than 1,000 lessors/owner-operators to provide transportation service for its clients.

64.     On information and belief, Defendants executed substantively identical Lease Agreements with more than 1,000 drivers.

65. Defendants have a regular practice of secretly altering their load confirmation sheets for all lessors/owner-operators with whom they contract, and then paying those lessors/owner-operators a percentage of the lower, secretly altered rate.

**B. Defendants Made Illegal Deductions From Plaintiffs' Compensation**

66. During many weeks that Plaintiffs worked for the company, Defendants deducted significant amounts from Plaintiffs' and the Classes' wages or final compensation.

67. Defendants deducted money from Plaintiffs' compensation for a so-called escrow account.

68. Defendants did not pay interest on Plaintiffs' escrow accounts or return the escrow to Plaintiffs who terminated their employment with Defendants.

69. Defendants deducted money from Plaintiffs' compensation for occupational accident insurance. The deductions for occupational accident insurance were not disclosed in Plaintiffs' Lease Agreements as a possible chargeback.

70. If drivers elected to have one of the Defendants calculate and pay the drivers' IFTA (fuel taxes) on the drivers' behalf, then Defendants required drivers to use the company's fuel card. Although Plaintiffs signed their Lease Agreements with Rocket, Defendants issued Plaintiffs a fuel card from Floyd. Every week, Defendants reduced Plaintiffs' settlement payments by the fuel charges on their respective Floyd-issued fuel cards.

71. Defendants negotiated rate discounts with multiple fuel stations, including Pilot and Loves. Defendants then required the Plaintiffs and other drivers to use Pilot and Loves fuel stations to purchase fuel.

72.     Despite having negotiated substantial discounts on the price of fuel, Defendants improperly charged Plaintiffs the non-discounted fuel price on their weekly settlement statements and retained the savings, thereby depriving the drivers of the rebate.

73.     The deductions that Defendants made from Plaintiffs' wages for fuel, occupational accident insurance, and escrow were neither (1) required by law; (2) to the benefit of the Plaintiffs and the other drivers; (3) in response to a valid wage assignment or wage deduction order; nor (4) made with the express written consent of the employees, given freely at the time the deductions were made.

74.     Mimic was aware of and approved these illegal deductions from Plaintiffs' wages.

75.     Defendants exercised direction and control over the performance of Plaintiffs' work.

76.     Defendants required Plaintiffs to follow a number of company rules and procedures. *See* Ex. F, Rules of Conduct, 9-10.

77.     Plaintiffs were truckers who performed work for Defendants, which operated a trucking company. Plaintiffs did not perform their work outside all of the Defendants' places of business.

## C.  Defendants' Joint Undertakings as Alter Egos

78.     Super Ego Holding maintains ownership and control over Defendants Floyd, Kordun, Rocket, Rex, and Jordan and operates them as a single entity with unity of interest.

79.     Carrier Defendants operate interchangeably. Even though Plaintiffs signed Lease Agreements to transport goods under Rocket's carrier license, they regularly delivered loads for other Carrier Defendants. Defendants' dispatchers instructed them to check in for pickups and deliveries under the names of Carrier Defendants other than Rocket.

80. Super Ego Holding also controls Rex and operates it with unity of interest with other Defendants and affiliated companies it controls. For instance, Ego Express LLC, an affiliated company, is listed as lessor, and Floyd is listed as registrant, of trucks that Rex purportedly leased to Plaintiffs. Super Ego Holdings advertised its rent-to-own program and advertised itself as the employing entity. Ex. E.

81. Defendants comingled funds from different Defendant entities to pay Plaintiffs for their load deliveries.

82. For instance, Walker's weekly settlement statements were sent to him under Rocket's name, and Walker's 1099 was issued by Floyd. Although Walker leased his truck from Rex, the truck was registered with the Illinois Secretary of State under Floyd, with Ego Express listed as the Lessor. Walker also regularly received altered load confirmation documents from Defendants listing different Carrier Defendants as the carrier for loads he transported, even though he was operating under Rocket's MC Number and DOT Number.

83. Atkinson's weekly settlement statements were sent to him under Rocket's name, and his 1099 was issued by Floyd. Although Atkinson leased his truck from Rex, the truck was registered with the Illinois Secretary of State under Vladimir Ilic as the Registrant and Ego Express as the Lessor. Atkinson also regularly received altered load confirmation documents from Defendants listing different Carrier Defendants as the carrier for loads he transported, even though he was operating under Rocket's MC Number and DOT Number.

84. Williams' weekly settlement statements were sent to him under Rocket's name. Williams also regularly received altered load confirmation documents from Defendants listing different Carrier Defendants as the carrier for loads he transported, even though his driver was operating under Rocket's MC Number and DOT Number.

85.     Greene's weekly settlement statements were sent to him under Rocket's name, and his 1099 was issued by Floyd. Although Greene leased his truck from Rex, the truck was registered with the Illinois Secretary of State under Floyd and with Ego Express registered as the Lessor. Greene also regularly received altered load confirmation documents from Defendants listing different Carrier Defendants as the carrier for loads he transported, even though he was operating under Rocket's MC Number and DOT Number.

86.     Based upon a search of the "SAFER" system maintained by the FMCSA, Defendant Super Ego Holding is not registered as a broker nor Motor Carrier and has not reported operating any semi-trucks (also known as power units or tractor trailers).[1]

87.     Despite having no FMCSA and no DOT number allowing it to operate as an interstate carrier, Super Ego Holding' website claims that:

> "Super Ego Holding is a transportation company recognized throughout the USA as the **best choice for your transportation needs**, as well as a model employer.
>
> A privately-owned company, permanently investing in its employees and the latest-model equipment, whose top priority is the customer satisfaction, Super Ego Holding is now a transportation company with recognizable name and reputation." (emphasis in original). Ex. E, 4.

88.     Despite having no FMCSA and no DOT number allowing it to operate as an interstate carrier, Super Ego Holding publishes advertisements to hire drivers and owner-operators to transport goods. Ex. E, at 1-2.

89.     When recruiting drivers, Super Ego staff or the staff of the related Carrier Defendants represent to the drivers that the various Defendants all operate together using the same employees under the Super Ego brand.

---

[1] The "Safer" database can be found at http://safer.fmcsa.dot.gov/CompanySnapshot.aspx.

90.     Despite having no FMCSA nor DOT number allowing it to operate as an interstate carrier, when advertising in its recruiting postings, Defendant Super Ego claims that it has "Over 2800 trucks! And they are coming every day!" (Ex. E, 3) and that they pay drivers "88% of every load." *Id.* at 2.

91.     Defendants commonly share drivers, dispatchers, and other administrative staff among the various businesses.

92.     Despite having no FMCSA nor DOT number allowing it to operate as an interstate carrier, Super Ego Holding is co-branded with its affiliate carriers on hundreds, if not thousands of semi-trucks and also has its branding on the sides and back of its trailers. *See, e.g.*, Ex. M, Photos of Super Ego Trucks.

93.     The logos of the Defendants Super Ego, Floyd, Kordun, and Rex, shown below, are also nearly identical in logo design, styling, and color scheme utilized.



**Class Allegations**

94.     Plaintiffs bring this action on behalf of themselves and the following classes of similarly situated individuals or entities, defined as:

TILA Class: All individuals or entities that signed equipment leases with any of the Defendants between August 5, 2012 and August 5, 2022 and were paid based on a percentage of the load rate.

IWPCA Class: All individuals who are in the TILA Class and picked up or delivered loads in Illinois.

95. The Classes defined above satisfy the requirements of Rules 23(a) and 23(g).

    a. **Numerosity.** The Classes are so numerous that joinder of all members is impracticable, and the disposition of their claims in a class action will provide substantial benefits to both the parties and the Court. Since 2012, Defendants have collectively executed Lease Agreements with more than 1,000 owner-operator drivers.

    b. **Commonality.** Common questions of law and fact predominate over individual issues affecting only individual class members. Questions of law and fact common to the TILA Class include, among others, the following:

        i. Whether Defendants paid interest on escrow funds as required by TILA regulations;

        ii. Whether Defendants charged owner-operator drivers for insurance without specifying the chargebacks in the drivers' equipment leases;

        iii. Whether Defendants unlawfully deducted the full price of fuel from drivers' settlements and retained the negotiated fuel discount;

        iv. Whether Defendant(s) fraudulently represented to the Plaintiff drivers that the gross receipts for a given load were lower than the amount actually collected by one or more Defendants;

        v. Whether Defendants breached the terms of their equipment leases with owner-operator drivers by paying them less than the promised percentage of gross receipts on each load.

        vi. Whether Defendants intentionally deceived owner-operator drivers by lying to them about the gross receipts for loads they hauled and on which their compensation was based;

vii.    Whether Defendants are jointly liable for all claims as alter egos.

viii.    Whether Defendants failed to return escrow funds due to the drivers.

Questions common to the IWPCA Class include, but are not limited to:

i.    Whether Defendants made deductions from Plaintiffs' and the IWPCA Class's wages without their written authorization at the time of the deduction;

ii.    Whether Plaintiffs and the IWPCA Class were Defendants' employees for purposes of the IWPCA.

c.  **Typicality**. Plaintiffs' claims are typical of the Classes' claims because they and all Class members were injured through Defendants' uniform misconduct. The claims of Plaintiffs and the Classes arise from the same operative facts and are based upon the same legal theories. There are no defenses unique to Plaintiffs.

d.  **Adequacy.** Plaintiffs will fairly and adequately protect and represent the interests the Classes because (i) Plaintiffs have retained competent and experienced counsel that have the time, experience, and resources to litigate this case; (ii) Plaintiffs are members of the Classes, their claims are typical of the Classes, and they have suffered substantially similar injuries to those suffered by the rest of the Classes; (iii) Plaintiffs' interest in obtaining monetary relief for their Classes is consistent with and not antagonistic to the interests of the Classes.

96.    The proposed Classes satisfy the requirements of Fed. R. Civ. P. 23(b)(3).

a.  **Predominance**. Common questions predominate over any individual questions because the important and prevalent issues in this case concern Defendants' conduct and its effects, which are common to the Classes. Individual issues are

minor and may be nothing more than damages calculations pursuant to a formula.

b. **Superiority**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages suffered by Plaintiffs and the Classes, while collectively substantial, are relatively small per Class member compared to the burden and expense required to individually litigate their claims. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Both liability and damages can be determined in one class-wide proceeding.

<u>**Count I - Breach of Contract**</u>
<u>**(By all Plaintiffs against all Defendants on behalf of the TILA Class)**</u>

97.     Plaintiffs incorporate all prior allegations as if fully stated herein.

98.     Defendant Rocket contracted with Plaintiffs and TILA Class members through Lease Agreements substantially identical to the one attached here as Exhibit F.

99.     The Lease Agreements all state, "CARRIER agrees to pay 88% of load pay offered…" Ex. F.

100.     Further, Plaintiffs' lease to purchase agreements with Rex state, "Lessee shall pay to Lessor 12% commission on all loads as offered to Lessee under this agreement, and as a working contractor at Lessor's Motor Carrier. . ." Ex. G.

101.    The contract reflects that the drivers were to receive 88%, and Defendants were to retain 12%, of the actual freight rate that brokers or shippers paid Defendants for the drivers' line haul transportation services.

102.    Although Plaintiffs and the TILA Class members signed Lease Agreements with Rocket, Defendants operated as alter egos, rather than separate corporate entities, to breach Plaintiffs' and the TILA Class members' Lease Agreements.

103.    Defendants altered load confirmation sheets to make the freight rates appear lower than the rates that brokers or shippers actually paid to Defendants. Defendants then sent the altered load confirmation sheets to Plaintiffs and the TILA Class members to make them falsely believe that Defendants were paying them in accordance with their work contracts.

104.    Plaintiffs and the TILA Class members substantially performed all their obligations under their contracts with the Defendants.

105.    Defendants breached the contracts with Plaintiffs and the TILA Class members by not paying them based on the real rate that brokers or shippers actually paid to Defendants.

106.    Defendants also breached the contracts by making unauthorized deductions from Plaintiffs' and the TILA Class members' wages.

107.    Defendants breached their duty of good faith and fair dealing by secretly modifying the original load confirmation paperwork in order to artificially reduce the listed shipping rates and retaining the difference for Defendants' benefit.

### Count II – Fraud
### (By all Plaintiffs against all Defendants on behalf of the TILA Class)

108.    Plaintiffs incorporate all prior allegations as if fully stated herein.

109.    Defendants made numerous false statements to Plaintiffs and the TILA Class concerning the actual freight rates that brokers and shippers paid Defendants for drivers' deliveries.

110. Defendants altered load confirmation sheets to make the freight rates appear lower than the rates that brokers or shippers actually paid to Defendants.

111. Defendants then sent the fraudulent load confirmation sheets to Plaintiffs to make them falsely believe that Defendants were paying them in accordance with their work contracts.

112. Defendants knowingly provided Plaintiffs and the TILA Class with falsified load confirmations.

113. Plaintiffs and the TILA Class had no reason to question the authenticity of the fraudulently modified load confirmation sheets.

114. For example, the fraudulently modified load confirmations were carefully altered by the Defendant(s) and were virtually identical in appearance to the brokers' original load confirmation s, and generally were on the broker's original letter head or otherwise bore the given issuing broker's logo.

115. Plaintiffs and the TILA Class reasonably and justifiably relied upon the false load confirmation sheets as though they were authentic.

116. Plaintiffs and the TILA Class incurred substantial damages in the form of underpayments for the services they offered because of Defendants' fraud.

117. Defendants' conduct was fraudulent, egregious, and malicious and justifies an award of punitive damages.

## Count III - Truth in Leasing Act
### (By all Plaintiffs against all Defendants on behalf of the TILA Class)

118. Plaintiffs incorporate all prior allegations as if fully stated herein.

119. Carrier Defendants are motor carriers licensed with the U.S. Department of Transportation. Plaintiffs worked for Defendants as an owner-operator for purposes of TILA.

120.    Pursuant to the TILA regulations, Rocket signed equipment leases with Plaintiffs and the TILA Class members.

121.    Although Plaintiffs signed Lease Agreements with Rocket, Defendants operated as alter egos, rather than separate corporate entities, to breach Plaintiffs' Lease Agreements.

122.    Under the TILA regulations, an authorized carrier may perform authorized transportation in leased equipment only if the written lease granting the use of the equipment meets the requirements of 49 C.F.R. § 376.12.

123.    Under the regulations, the required lease provisions must be "adhered to and performed by the authorized carrier." *Id.* § 376.12 (introductory paragraph). The TILA also requires that leases disclose all "chargebacks," or deductions from compensation. *Id.* at § 376.12(h). Finally, the regulations require the carrier to pay interest on the amounts that it holds in escrow. *Id.* § 376.12(k)(5).

124.    Defendants did not disclose the amounts of certain chargebacks on their Lease Agreements with Plaintiffs, including for occupational accident insurance.

125.    Defendants never paid interest on the amounts they deducted in escrow from Plaintiffs' and the other owner-operator drivers' pay.

126.    Defendants required Plaintiffs to use their fuel cards to purchase gas at regular market price, despite the fact that Defendants had negotiated a hefty discount. Gas stations then reimbursed Defendants for the different between the market price and the discounted price, but Defendants charged Plaintiffs for the full price of gas. The Lease Agreements did not authorize Defendants to charge Plaintiffs more than the actual price of fuel that Plaintiffs used to operate Defendants' vehicles.

127.    In the Lease Agreements, Defendants agreed to pay Plaintiffs and the other owner-operator drivers a certain percentage of gross revenue for each load they hauled for Defendants.

128.    Defendants falsely represented the actual rates the  loads in order to pay Plaintiffs and the other owner-operator drivers less than the amount promised in their Lease Agreements.

129.    Defendants did not adhere to the terms of the Lease Agreements.

130.    Under 49 U.S.C. §14704(a)(2), Defendants are liable to Plaintiffs and the TILA Class for the damages that they suffered on account of Defendants' regulatory violations.

**Count IV – Conversion**
**(By all Plaintiffs against all Defendants on behalf of the TILA Class)**

131.    Plaintiffs incorporate all prior allegations as if fully stated herein.

132.    Plaintiffs and the TILA Class are the rightful owners of monies that Defendants unlawfully deducted and retained as set forth in this Class Action Complaint.

133.    Defendants possess or have benefited from converting funds intended for and owned by Plaintiffs and the TILA Class.

134.    Plaintiffs and the TILA Class have lost the use, interest, and benefit of their monies because of Defendants engaged in fraud in order to convert their monies.

**Count V- Illinois Consumer Fraud and Deceptive Business Practices Act**
**(By all Plaintiffs against all Defendants on behalf of the TILA Class)**

135.    Plaintiffs incorporate all prior allegations as if fully stated herein.

136.    Defendants deceived Plaintiffs and the TILA Class by lying and under-reporting the gross revenues Defendants received for loads hauled by Plaintiffs and the TILA Class.

137.    Defendants advertised that they would pay owner-operators 88% of each load delivery.

138.    Pursuant to the Lease Agreements, Defendants were required to pay Plaintiffs and the TILA Class 88% of gross revenues Defendants received for loads hauled by Plaintiffs and the TILA Class.

139.    Defendants intended that Plaintiffs and the TILA Class would rely on Defendants' reports of the gross revenues so that Defendants could pay Plaintiffs and the TILA Class less than the amounts they were owed pursuant to their equipment leases.

140.    Defendants engaged in deceptive and unfair practices in the conduct of their business, in violation of 815 ILCS §§ 505/2, 510/2(a), by engaging in the acts and practices alleged herein.

141.    Defendants' unfair and deceptive practices and acts were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and the TILA Class.

142.    Defendants' deceptive business practices happened in the course of trade or commerce.

143.    Defendants' deception and unfair business practices proximately caused Plaintiffs and the TILA Class to be paid less than the amounts they were owed pursuant to their Lease Agreements.

144.    Defendants' deceptive acts were designed to enrich Defendants without regard to the effect on Plaintiffs and the TILA Class.

**Count VI – Civil Conspiracy**
**(By all Plaintiffs against all Defendants on behalf of the TILA Class)**

145.    Plaintiffs incorporate all prior allegations as if fully stated herein.

146.    Defendants knowingly and willfully conspired and agreed among themselves to defraud Plaintiffs and the TILA Class of the amount of compensation promised to them by contract.

147. In furtherance of said conspiracy and agreement, Defendants engaged in fraud, fraudulent representations, omissions and concealment of facts, acts of coverup, and consumer fraud—all calculated to defraud Plaintiffs and the TILA Class of the compensation they were owed and conceal the fraud from Plaintiffs and the TILA Class.

148. All of the actions of Defendants set forth in the preceding paragraphs were in violation of the rights of Plaintiffs and the TILA Class and committed in furtherance of the aforementioned conspiracies and agreements.

149. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the TILA Class were deprived of compensation due and owing to them under their Lease Agreements. Plaintiffs and the TILA Class have suffered ascertainable losses of money and property and sustained monetary damages.

150. Defendants carried out these acts with willful and conscious disregard for Plaintiffs' and the TILA Class's rights with the intention of defrauding Plaintiffs and the TILA Class of money or otherwise causing injury, and subjected Plaintiffs and the TILA Class to unjust hardship so as to justify an award of exemplary and punitive damages.

### Count VII – Illinois Wage Payment and Collections Act
#### (By Plaintiffs Atkinson and Greene against all Defendants on behalf of the IWPCA Class)

151. Plaintiffs incorporate all prior allegations as if fully stated herein.

152. Plaintiffs Atkinson and Greene were employees of Defendants for purposes of the IWPCA.

153. Plaintiffs traveled to Illinois to pick up the trucks they leased from Defendants and attend orientation training on Defendants' company policies and procedures.

154.    Plaintiffs Atkinson and Greene regularly used Illinois roadways to haul loads and picked up and dropped off shipments in Illinois.

155.    Defendants made deductions from Plaintiffs' and the IWPCA Class's wages for Defendants' benefit without Plaintiffs' written authorization at the time of those deductions.

156.    Defendants withheld final compensation from Plaintiffs and members of the IWPCA Class who terminated their employment with Defendants.

157.    Defendants refused to pay Plaintiffs and members of the IWPCA Class wages that they earned under their Lease Agreements.

**Prayer for Relief**

Plaintiffs, individually and on behalf of the Classes, respectfully pray for the following relief:

    a.    An order certifying the Classes as defined above, appointing all Plaintiffs as the representatives of the TILA Class and Plaintiffs Atkinson and Greene as representatives of the IWPCA Class and appointing their counsel as Class Counsel for both Classes;

    b.    An award of all economic, monetary, actual, consequential, compensatory, and punitive damages available under the law;

    c.    An award of restitution and disgorgement;

    d.    An award of all equitable relief requested herein;

    e.    An award of reasonable litigation expenses and attorneys' fees;

    f.    An award of pre- and post-judgment interest, to the extent allowable; and

    g.    Other further relief that the Court deems just and reasonable.

**Jury Demand**

Plaintiffs demand trial by jury on all issues as to which a jury trial is available.

Date: August 5, 2022                    Respectfully submitted,

                                        /s/ Christopher J. Wilmes
                                        One of the Attorneys for the Plaintiffs

Christopher J. Wilmes
cwilmes@hsplegal.com
Emily R. Brown
ebrown@hsplegal.com
Hughes Socol Piers Resnick & Dym
70 W. Madison St., Ste. 4000
Chicago, IL 60602
(312) 580-0100

James Stark
jstark@framewills.com
Stark Law Offices, LLC
110 W Roosevelt Rd.
Wheaton, IL 60187
(708) 228-1017