# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LARRY ATKINSON, EUGENE WALKER, JASON GREENE, AND GIOVANNI WILLIAMS, individually and on behalf of others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>SUPER EGO HOLDINGS, LLC, FLOYD, INC., KORDUN EXPRESS, INC., ROCKET EXPEDITING, LLC, JORDAN HOLDINGS, INC., REX TRUCKING, INC., AND ALEKSANDAR MIMIC,<br><br>    Defendants. | Case No. 1:22-cv-04127<br><br>Honorable Martha M. Pacold |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO RULE 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

## I. INTRODUCTION

At bottom, this case is a compensation dispute between a motor carrier and independent contractor drivers. And while Plaintiffs have asserted a smattering of different claims, each rests on a fundamental misreading of the plain language of the parties' agreements. The parties' written agreements unambiguously stated that Defendants[1] only "agree[d] to pay 88% of load pay offered" to Plaintiffs by Defendants. Despite that, Plaintiffs allege that Defendants breached their contract, committed fraud, converted money, engaged in a conspiracy, and violated consumer protection laws when it did not pay Plaintiffs 88% of the gross revenue Defendants received their shipper and broker customers. *See Compl.*, ¶¶ 2, 42 (ECF No. 1). Of course, that is not what Plaintiffs' agreement says Plaintiffs were entitled to. And the only loads identified in the Complaint that allegedly involve underpayments actually show that Defendants paid Plaintiffs 88% of the load pay offered Defendants offered. In fact, Plaintiffs *never* allege that Defendants failed to pay the rates Defendants offered to Plaintiffs. Plaintiffs' cannot escape the plain language of the parties' agreement. Because Counts I-VI are all premised on Plaintiffs' incorrect interpretation of the contract, the Court should dismiss them.

## II. BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs are non-Illinois resident over the road truck drivers that provide transportation services throughout the United States as owner-operators. *Compl.*, ¶¶ 31, 41. Each signed an independent contractor agreement with Rocket Expediting LLC (Independent Contractor Agreement). *Compl.*, ¶¶ 31, 41; Ex. F.[2] Plaintiffs also signed an Equipment Lease to Purchase

---

[1] Plaintiffs allege all Defendants are alter egos of one another and generally make all allegations and bring all claims against all Defendants collectively. Defendants dispute this. However, consistent with Plaintiffs' Complaint and Defendants' obligation to accept Plaintiffs' allegations as true, this brief refers to Defendants collectively. Defendants reserve their right to challenge Plaintiffs' Complaint allegations with actual facts and evidence.

[2] Plaintiffs' Complaint refers to the Independent Contractor Agreement as the "Lease Agreement."

Agreement (Equipment Lease). *Compl.*, ¶¶ 30, 44; Ex. G.

Under the Independent Contractor Agreement, Defendants "agree[d] to pay 88% of load pay offered, minus applicable escrow deductions, cargo & liability insurance, cash advances, fines, violations, damage payments, deductibles, fuel card payments and any/all agreed upon damage/payments." *Id.*, ¶ 43; Independent Contractor Agreement, ECF No. 1-6 at 3. Similarly, when Plaintiffs signed the Equipment Lease, they agreed to "pay to Lessor, 12% commission on all loads as offered to [Plaintiffs]." *Id.*, ¶ 44; Equipment Lease, ECF No. 1-7 at 5.

Even though their agreements plainly stated that they would receive 88% of the load pay Defendants offered to them, Plaintiffs allege Defendants should have paid them "88% rate of gross receipts for each load"—i.e., 88% of the rate Defendants charged its own customers, rather than 88% of the rate Defendants offered Plaintiffs. *Compl.*, ¶ 41. Plaintiffs rely on this misreading of their agreements to bring several claims against Defendants, including: (1) breach of contract, (2) common law fraud, (3) violations of the Truth in Leasing Act (TILA), (4) conversion, (5) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act), (6) civil conspiracy, and (7) violations of the Illinois Wage Payment and Collections Act (IWPCA). Defendants now move to dismiss Counts I-VI for the reasons explained below.

### III.  ARGUMENT

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court accepts all well-pleaded facts as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678. The Court can consider agreements referenced in the pleadings without converting the motion into a summary judgment motion. *See Pennington v. ZionSolutions, LLC*, 2013 WL 3895263, at *1 n.2 (N.D. Ill. July 29, 2013).

### A. The Parties' Written Agreements Foreclose Plaintiffs' Breach of Contract Claim.

To assert a breach of contract, Plaintiffs must allege: (1) the contract existed, (2) the Plaintiffs performed, (3) Defendants breached, and (4) damages. *Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 861 (7th Cir. 2020). Illinois adheres to the "four corners rule," under which "'[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it." *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (1999) (citation omitted). In other words, a contract "speaks for itself, and the intention with which it was executed must be determined from the language used [and] is not to be changed by extrinsic evidence.'" *Id.*

#### 1. Plaintiffs have not alleged breach or damages on their compensation breach of contract theory.

The plain language of the parties' agreements—*and Plaintiffs' own Complaint*–show that Plaintiffs cannot establish breach or damages. In their agreements, Defendants agreed to pay Plaintiffs "88% of load pay *offered*." *Compl.*, ¶ 43 (emphasis added); Independent Contractor Agreement, ECF No. 1-6 at 3; Equipment Lease, ECF No. 1-7 at 5. Plaintiffs concede this in their Complaint. *Compl.*, ¶¶ 43, 44, 99, 100. In fact, the only examples of "underpayment" Plaintiffs include in their Complaint prove Defendants *did* pay 88% of the load pay Defendants offered:

- In paragraph 49, Plaintiffs allege Defendants offered Atkinson a trip for $3,500 load pay and Defendants paid 88% of the offered amount. *Compl.*, ¶ 49.

- In paragraph 54, Plaintiffs allege Defendants offered Walker a trip for $1,700 load pay and Defendants paid 88% of the offered amount. *Compl.*, ¶ 54.

- In paragraph 56, Plaintiffs allege Defendants offered Greene a trip for $1,500 load and Defendants paid 88% of the offered amount. *Compl.*, ¶ 56.

The "four corners" of the parties' agreements are clear. Defendants paid Plaintiffs according to the parties' agreement, and Plaintiffs make no allegation that, for any trip, Defendants

ever failed to pay "88% of load pay *offered*." Instead, Plaintiffs allege that Defendants breached the contracts by failing to pay them based on the "rate[s] that brokers or shippers actually paid to Defendants." *Compl.*, ¶ 105. But nothing in the parties' agreements support Plaintiffs' position. The parties agreed in the Independent Contractor Agreement that Defendants would only pay "88% of load pay *offered*" to Plaintiffs. *Compl.*, ¶ 43; Independent Contractor Agreement, ECF No. 1-6 at 3.

Agreeing to pay "88% of load pay *offered*" by Defendants is different from Plaintiffs' assertion that they should receive 88% of the gross revenue Defendants' received from the broker or shipper. The unambiguous language of the Independent Contract Agreement alone forecloses Plaintiffs' claim. *Page v. Alliant Credit Union*, No. 19-CV-5965, 2021 WL 1546437, at *2 (N.D. Ill. Apr. 20, 2021) ("[w]hen an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss.") (*quoting Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013)).[3] As a result, The Court should dismiss Plaintiffs' claim because Defendants have not breached the agreements and Plaintiffs suffered no damage. *Morse v. Donati*, 136 N.E.3d, 1043, 1049-50 (Ill. App. Ct. 2019) (failure to prove damages is fatal to breach of contract claim).

### 2. Plaintiffs have not alleged a breach of contract claim on their deductions theory.

Plaintiffs assert Defendants breached the parties' written agreements by making "unauthorized deductions." *Compl.*, ¶ 107. While Plaintiffs purport to identify "illegal" deductions they claim Defendants did not adequately disclose under TILA or that violated the IWPCA,

---

[3] The language of the Parties' Equipment Lease, which mimics the compensation provision in the parties' Independent Contractor Agreements, reinforces this conclusion. The Equipment Lease states, "Lessee [Plaintiffs] shall pay to Lessor [Defendants], 12% commission on all loads *as offered to Lessee* under this agreement." *Compl.*, ¶ 44; Equipment Lease, ECF No. 1-7 at 5 (emphasis added). It is impossible to square Plaintiffs' position with the plain terms of the parties' agreements.

5

*Compl.*, ¶¶ 66-77, Plaintiffs fail to identify a specific deduction that Defendants made that Plaintiffs allege violated the parties' agreements. Nor can they. The Independent Contractor Agreement authorized Defendants to make deductions from Plaintiffs' settlements. *See, e.g.*, Independent Contractor Agreement, ECF No. 1-6 at 3-4, 8. Because Plaintiffs fail to allege any deduction violated the parties' written agreements, and because the agreements allow Defendants to make deductions, the Court should dismiss Plaintiffs' contract claim premised on deductions with prejudice. *Page*, 2021 WL 1546437, at *2.

### 3. The Court should dismiss any breach of contract claim premised on the implied duty of good faith and fair dealing.

Illinois does not recognize an independent cause of action for breach of the implied duty of good faith and fair dealing. S*ee, e.g.*, *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 381 (7th Cir. 2000). To use the duty of good faith and fair dealing, a party must show that the contract vested the other party with discretion in performing an obligation under the contract and the other party exercised that discretion in bad faith, unreasonably, or in a manner inconsistent with the parties' reasonable expectations. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443–45 (7th Cir. 1992).

The covenant of good faith and fair dealing does not apply here. Plaintiffs do not allege that Defendants were given broad discretion under the parties' agreements or that Defendants acted unreasonably or arbitrarily in exercising discretion. *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003). Nor can Plaintiffs use the doctrine to rewrite the agreements because Illinois law holds that an implied covenant of good faith cannot overrule or modify the express terms of a contract. *Id.* at 395–96. The parties' agreements provide that Plaintiffs would receive 88% of the load pay Defendants offered. Plaintiffs own allegations show Defendants paid them 88% of the load pay offered. The covenant of good faith and fair dealing does not apply.

6

> **B.     The Court should dismiss Plaintiffs' fraud claim because Plaintiffs have not alleged damages or detrimental reliance.**

For fraud, Plaintiffs must establish that there was "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) an action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Doe v. Dilling*, 888 N.E.2d 24, 35-36 (Ill. 2008). Under Rule 9(b)'s heightened pleading standard, a plaintiff also "must state with particularity the circumstances constituting fraud" and "state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014).

Plaintiffs build their fraud claim on the same faulty premise from which they constructed their breach of contract claim–that Defendants agreed to pay Plaintiffs 88% of gross revenue received from customers. Using that premise, Plaintiffs allege that Defendants defrauded them by furnishing altered load confirmation sheets so that Plaintiffs would believe they were being paid 88% of the gross revenue received from customers. *Compl.*, ¶¶ 2, 38-65, 108-117. But, as described above, Defendants never agreed to pay Plaintiffs 88% of the gross revenue they received from customers. Given this, there are several reasons the Court should dismiss Plaintiffs' fraud claim.

First, it is not plausible that Defendants intended to use the load confirmation sheets to make a false statement of material fact or that Plaintiffs justifiably relied on those sheets to their detriment. Defendants never had an obligation to pay Plaintiffs 88% of the gross revenue Defendants' received from customers. *See supra* Section III.A. As Plaintiffs concede, the load confirmation sheets accurately showed the load pay Defendants offered to Plaintiffs and Plaintiffs in fact received 88% of the offered load pay. Plaintiffs *never* allege either (1) that the amount on

7

the load sheet was anything but the load pay that Defendants offered them, or (2) that Defendants ever failed to pay 88% of the load pay offered. The rates Defendants independently charged their customers have no bearing on Plaintiffs' claims because the only amount Plaintiffs had a right to receive under the parties' agreements—and the amounts Plaintiffs concede they in fact received—was 88% of the load pay Defendants offered.

Second, Plaintiffs fail to plausibly allege damages. "[D]amages is an essential element of fraud." *Castlerigg Master Investments, Ltd. v. AbbVie, Inc.*, 191 N.E.3d 121, 127 (Ill. App. Ct. 2021). The only alleged damages Plaintiffs identify are the "underpayments for the services they offered" based on Plaintiffs' misreading of the parties' agreement. *Compl.*, ¶ 116. There were no underpayments here because Plaintiffs concede Defendants paid Plaintiffs everything they were owed under the parties' agreements—i.e., 88% of the load pay offered. *See supra* Section III.A . As a result, Plaintiffs fail to allege damages. *See Dloogatch v. Brincat*, 920 N.E.2d 1161, 1171 (Ill. App. Ct. 2009).

Third, Plaintiffs fail to allege they justifiably relied to their detriment on Defendants' alleged misrepresentations. "[I]t is essential to a finding of fraud that the plaintiff has been induced by the fraud to act to his detriment." *Kurti v. Fox Valley Radiologists, Ltd.*, 464 N.E.2d 1219, 1223 (Ill. App. Ct. 1984). Even accepting Plaintiffs' allegations as true, they received exactly what they bargained for when they signed the written agreements—88% of the load pay offered. As a result, Plaintiffs did not suffer any detriment because they received all that they were entitled to. *See Bachman v. Bear, Stearns & Co., Inc.*, 57 F. Supp. 2d 556, 563 (N.D. Ill. 1999).

Plaintiffs similarly cannot rely on any alleged pre-contractual communications, like "job postings," *Compl.*, ¶ 38, or statements by recruiters, *id.*, ¶ 39, to establish justifiable reliance. For

8

starters, Plaintiffs simply allege a "job posting promis[ed] '88% of all loads,"[4] and a recruiter promised "88% of each load." *Compl.*, ¶¶ 38, 39. This is not misleading. Plaintiffs do not allege that any advertisement or recruiter said that they would receive 88% of gross revenue received from a shipper or broker. Nor is there any assertion in Plaintiffs' Complaint that they relied on these statements to their detriment. But even if there were, Plaintiffs' reliance on these alleged promises would be unjustified because their allegations contradict the plain language of the parties' agreement, which provides that Plaintiffs would receive 88% of the load pay Defendants offered. *Rustom v. Rustom*, No. 17 C 9061, 2019 WL 4034620, at *4 (N.D. Ill. Aug. 27, 2019) (granting motion to dismiss fraud claim and holding "Plaintiff's alleged reliance was not justified" because the alleged false representations contradicted the written contract).

Similarly, Plaintiffs cannot rely on the alleged altered load confirmation sheets to sustain their fraud claim. Although Plaintiffs' generically claim they relied on the load confirmation sheets, they don't allege *how* they relied on them or *whether* they relied on them to their *detriment*, or *when* they did so. There is no allegation that Defendants sent any of the load confirmation sheets to Plaintiffs before they were offered and accepted the load pay Defendants communicated to them (and which Plaintiffs concede Defendants paid 88%, under the parties' agreements).

Finally, the alleged false statements made by Defendants' dispatchers about the load confirmation sheets cannot save Plaintiffs' fraud claim because these allegations do not come close to meeting Rule 9(b)'s pleading standard. Plaintiffs' do not identify the who, what, when, where, or how of the alleged false dispatcher statements, nor do they provide specific detail about the content of the statements. For example, Atkinson alleges that in some two-month period in 2022,

---

[4] Plaintiffs do not even allege they ever saw the "job posting" attached to their Complaint before deciding to contract with Defendants. In fact, the "job posting" attached to Plaintiffs' Complaint says it was posted "7 days ago," ECF No. 1-5 at 3—i.e., on July 29, 2022. *Id.* Plaintiffs' Complaint concedes they contracted with Defendants *before* this "job posting" existed. *Compl.*, ¶¶ 6-9.

9

he called some unnamed broker who sent him an "original" load confirmation sheet for an unspecified load. *Compl.*, ¶ 51. Then, at some unknown later date, Atkinson "inquired about" (he does not say if he did so in-person, over the phone, or some other way) an alleged discrepancy he perceived with an unnamed dispatcher of an unspecified defendant. *Compl.*, ¶ 52. Plaintiffs allege this mystery person "lied" and told Atkinson "the broker had made a 'mistake' on the load rate." *Id.* There are no particular allegations about when this "lie" was told, who told it, where they told it, or what precisely was said that Plaintiffs allege was a "lie." Nor is there any allegation that Atkinson believed this "lie" to be true at the time and relied to his detriment on the "lie."

The other Plaintiffs' allegations follow Atkinson's lead and fail to plead fraud with particularity under Rule 9. *Compl.*, ¶¶ 53-58. Even more, they make allegations that are both self-contradictory and are also contradicted by Plaintiffs' own exhibits. For example, Walker alleges he contracted with Defendants from July 2021 to August 2022 and that he first learned Defendants were allegedly altering load confirmation documents in September 2021 (three months into his tenure). *Compl.*, ¶¶ 7, 53-54. So Walker claims he continued contracting another 11 months *even after discovering* Defendants' were allegedly defrauding him. *Id.*[5] At a minimum, Defendants are entitled to dismissal of Walker's fraud claim because he alleges he was aware of the alleged fraud by September 2021 but continued hauling loads for months anyway. *Bulley & Andrews, Inc. v. Symons Corp.*, 702, 323 N.E.2d 806, 811 (1975) (holding "trial court properly dismissed the fraud count of plaintiff's complaint" when plaintiff "continu[ed] to work under the contract" for months after discovering alleged fraud).

---

[5] To support Walker's supposed revelation in September 2021, Plaintiffs attached as Exhibit J to the Complaint the specific load confirmation documents that allegedly tipped Walker off. *Compl.*, ¶ 53-54; ECF No. 1-10 (Exhibit J). But the load confirmation documents in Exhibit J show deliveries on March 30 & 31 of 2022, *not in September 2021*.

The same is true for Plaintiffs Greene and Williams. Greene says he discovered the alleged fraud based on a load confirmation sheet dated December 22, 2021. *Compl.*, ¶ 56; ECF No. 1-11 (Exhibit K). But he contracted with Defendants during two periods—from December 2021 to March or April of 2022, and then again from June to July 2022. *Compl.*, ¶ 8. Likewise, Plaintiff Williams claims he learned about the alleged fraud from a load his driver delivered on August 7, 2021. *Compl.*, ¶ 58; ECF No. 1-12 (Exhibit L). Williams says he worked for Defendants from July to October or November 2021. *Compl.*, ¶ 9. So both Greene and Williams discovered the alleged fraud at the beginning of their tenures but continued accepting loads for months anyway. Even more, Greene left and then came back for a second stint, *after he discovered the alleged fraud*.

In short, Plaintiffs' fraud allegations are self-defeating, do not meet the heightened pleading standard under Rule 9, and do not establish Defendants made false statements of material fact which Plaintiffs reasonably relied on to their detriment.

## C. Plaintiffs' Under-Compensation Theory Under TILA Fails.

The TILA Regulations apply when a motor carrier seeks to "perform authorized transportation in equipment it does not own" by leasing from the owner of the equipment. 49 C.F.R. § 376.11. The regulations mandate "a written lease" between the motor carrier and the owner of the equipment and require certain disclosures, but do not dictate the parties' terms. *Id.* §§ 376.11(a), 376.12. Under 49 U.S.C. § 14704(a)(2), an owner-operator may recover "damages sustained . . . as a result of an act or omission" by a motor carrier in violation of TILA regulations.

Echoing their contract claim, Plaintiffs allege that Defendants' failure to pay them 88% of the gross revenue received from customers also violates the TILA Regulations. *Compl.*, ¶¶ 28, 127-130; 49 C.F.R. § 376.12(d). The Independent Contractor Agreement disclosed how Defendants would pay Plaintiffs, in compliance with 49 C.F.R. § 376.12(d). The Independent Contractor Agreement provided that Plaintiffs would receive 88% of the load pay offered, not 88%

11

of the gross revenue received from the customer. Plaintiffs admit they received 88% of the load pay offered. The Court should dismiss Plaintiffs' claim under 49 C.F.R. 376.12(d).

Nor can Plaintiffs recover under Section 376.12(g) because that provision only applies if Plaintiffs' compensation is "based on a percentage of the gross revenue for a shipment." 49 C.R.F. § 376.12(g). Plaintiffs compensation was not based on a percentage of gross revenue that any Defendant received from a broker or shipper. Instead, Defendants agreed to pay Plaintiffs a flat rate per load—"88% of load pay offered" by Defendants and accepted by Plaintiffs. For these reasons, 49 C.F.R. 376.12(g) does not apply.

### D. The Court Should Dismiss Plaintiffs' Conversion Claim.

To state a claim for conversion, a plaintiff must establish that (1) it has a right to a certain property, (2) that it has a present and unconditional right to immediate possession of the property, (3) that defendant wrongfully and without authorization assumed control, dominion, or ownership over the plaintiff's property, and (4) that the plaintiff made a demand for the return of that property. *Van Diest Supply Co. v. Shelby Cty. State Bank*, 425 F.3d 437, 439 (7th Cir. 2005). Plaintiffs' conversion claim alleges that Defendants failed to pay Plaintiffs' money for services Plaintiffs rendered under the parties' contracts. The Court should dismiss this claim for three reasons.

First, Plaintiffs do not allege they made a demand before suing. "[M]aking a demand prior to filing a lawsuit is necessary to sustain a conversion claim under Illinois law." *Stevens v. Interactive Fin. Advisors, Inc.*, 830 F.3d 735, 742 (7th Cir. 2016); *see Van Diest Supply Co.*, 425 F.3d at 439. Filing a lawsuit does not meet the demand requirement for a conversion claim. *Stevens*, 830 F.3d at 742. As a result, this claim should be dismissed.

Second, Plaintiffs do not seek to recover specific chattel. "[T]he general rule is that" a plaintiff cannot sue a defendant for conversion for "a general debt or obligation" to pay money. *In re Thebus*, 108 Ill. 2d 255, 261, 483 N.E.2d 1258, 1261 (1985). Money is recoverable only if it is

12

"capable of being described as a specific chattel." *Id.* A conversion fails when based on "a mere obligation to pay money." *Id.* When that's the case, "a defendant . . . is liable for a debt rather than a conversion." *Sutherland v. O'Malley*, 882 F.2d 1196, 1200 (7th Cir. 1989). A Court should dismiss a conversion claim when it is "nothing more than a claim that [defendant] has not paid [plaintiff] for work it performed under the contract." *R.E.I. Transp., Inc. v. C.H. Robinson Worldwide, Inc*., 2007 WL 854005, at *3 (S.D. Ill. Mar. 16, 2007), amended, No. CIVIL NO. 05-57-GPM, 2007 WL 4225669 (S.D. Ill. July 10, 2007). Far from alleging Defendants converted "a specific fund or specifically-identifiable money," *Song v. PIL, L.L.C.*, 640 F. Supp. 2d 1011, 1017 (N.D. Ill. 2009), Plaintiffs instead allege that Defendants owe them—and "thousands of other individuals and businesses"—"monies that Defendants unlawfully deducted and retained." *Compl.*, ¶¶ 5, 132. In other words, the basis of Plaintiffs' conversion claim is Defendants' alleged failure to pay them for loads, or for deductions taken, under the parties' contracts. Thus, "[t]he money at issue in this case does not fall within the limited circumstances under which money can be subject to a claim for conversion." *Doing Steel, Inc. v. Castle Constr. Corp.*, No. 02 C 1674, 2003 WL 21254345, at *3 (N.D. Ill. May 23, 2003); *see also Horbach v. Kaczmarek*, 288 F.3d 969, 975 (7th Cir. 2002).

Finally, Plaintiffs must allege that the money "*at all times* belonged to" them "unconditionally." *Horbach v. Kaczmarek*, 288 F.3d 969, 978 (7th Cir. 2002); *In re Thebus*, 483 N.E.2d at 1261. Plaintiffs cannot show the money they seek for services performed under the contract unconditionally belonged to them *at any time*, let alone "at all time." This money originally belonged *to third-party* shippers and brokers. Because Plaintiffs allegations demonstrate the funds did not belong to them at all times, the Court should dismiss this claim. *DeGeer v. Gillis*, 707 F. Supp. 2d 784, 791 (N.D. Ill. 2010).

### E. Plaintiffs' Consumer Fraud Claim Should Be Dismissed.

Under the Consumer Fraud Act, a plaintiff must show: "(1) a deceptive act or practice; (2) intent by the defendant that the plaintiff rely on the deception; (3) the deception occurred in the course of conduct involving trade or commerce; and (4) the plaintiff's injury was proximately caused by the fraud complained of." *Rockford Mem'l Hosp. v. Havrilesko*, 858 N.E.2d 56, 62 (Ill. App. Ct. 2006). For non-consumers, the plaintiff must allege facts showing that "the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *Lefebvre Intergraphics, Inc. Sanden Machine, Ltd.*, 946 F. Supp. 1358, 1368 (N.D. Ill. 1996).

#### 1. Plaintiffs' Consumer Fraud Act claim is merely a contract claim under a different name.

A breach of contract is not actionable under the Consumer Fraud Act. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 844 (Ill. 2005); *see also Song*, 640 F. Supp. 2d at 1018; *Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899, 901-02 (7th Cir. 2006); *Wooley v. Jackson Hewitt, Inc.*, 540 F. Supp. 2d 964, 971-72 (N.D. Ill. 2008).

Plaintiffs' consumer fraud claim simply restates the breach of contract claim—i.e., Defendants did not pay Plaintiffs under Plaintiffs' reading of the parties' agreements. *Compare Compl.*, ¶¶ 135-144 *with Compl.*, ¶¶ 136-139. These allegations are "nothing more than the failure to fulfill [an alleged] promise." *Shaw*, 461 F.3d at 902. The Court should dismiss Plaintiffs' Consumer Fraud Act claim. *See Song*, 640 F. Supp. 2d at 1018.

#### 2. Defendants alleged wrongful conduct does not implicate consumer protection concerns.

Plaintiffs are not consumers who bought products from Defendants. A consumer is defined under the Act as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his

household." 815 Ill. Comp. Stat. 505/1(e). Plaintiffs are not consumers under the plain language of the statute. As a result, the statute applies only if they show that the conduct on which they base their claim is a trade practice addressed to the market generally or that implicates consumer protection concerns. *Lefebvre Intergraphics*, 946 F. Supp. at 1368. Thus, Plaintiffs must allege "sharp business practices designed to mislead consumers about a competitor, or an implication of health, safety or welfare issues." *Credit Ins. Consultants, Inc. v. Gerling Glob. Reinsurance Corp. of Am.*, 210 F. Supp. 2d 980, 986 (N.D. Ill. 2002).

Plaintiffs allege nothing of the sort here. Rather, Plaintiffs allege fraudulent statements about individual contracts for payment. That cannot sustain a claim under the Consumer Fraud Act. The parties' contracts do not address the market generally, and Plaintiffs alleged Defendants made the fraudulent statements to Plaintiffs, not to the general public. *See Harris*, 2009 WL 2222740, at *9. Because Plaintiffs do not allege how Defendants' alleged fraudulent actions implicate consumer protection concerns or address the market generally, this claim must be dismissed.

### F. Plaintiffs' Civil Conspiracy Claim Must Fail Because the Tort Claims Underlying the Conspiracy Fail.

Under Illinois law, a civil conspiracy claim can only survive if there is an underlying tort. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007); *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 720 N.E.2d 242, 258 (Ill. 1999). Here, because the claims underlying Plaintiffs' conspiracy allegations must be dismissed, Plaintiffs' conspiracy claim must be dismissed as well. *See Cannon v. Forest Pres. Dist. of Cook Cnty.*, No. 14 C 5611, 2015 WL 921037, at *5 (N.D. Ill. Feb. 26, 2015).

## IV. CONCLUSION

The Court should grant Defendants' motion and dismiss Counts I-VI of the Complaint.

Dated: October 17, 2022          Respectfully submitted,

*/s/ Charles Andrewscavage*
Charles Andrewscavage
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
30 West Monroe Street, Suite 1600
Chicago, IL 60603
Phone: 312-255-7200
Fax: 312-422-1224
candrewscavage@scopelitis.com

*Attorney for Defendants,*
*Super Ego Holdings, LLC, Floyd, Inc., Kordun Express, Inc., Rocket Expediting, LLC, Jordan Holdings, Inc., Rex Trucking, Inc., and Aleksandar Mimic*

4889-2657-3878, v. 24

16