**IN THE U.S. DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| LARRY ATKINSON, EUGENE WALKER, JASON GREENE, GIOVANNI WILLIAMS, CHARLES CROSS, and TERRILL CLAY, on behalf of themselves and others similarly situated, | Case No. 22-cv-04127 |
| Plaintiff, | |
| v. | |
| SUPER EGO HOLDING LLC; FLOYD, INC., KORDUN EXPRESS, INC., ROCKET EXPEDITING LLC, JORDAN HOLDINGS, INC. d/b/a/ JHI TRANSPORT; REX TRUCKING, INC., HAIDAR DAWOOD LLC; and ALEKSANDAR MIMIC | Hon. Martha Pacold |
| Defendants. | |

## FIRST AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

Plaintiffs Larry Atkinson, Eugene Walker, Jason Greene, Giovanni Williams, Charles

Cross, and Terrill Clay, bring this case individually and on behalf of all others similarly

situated against Defendants Super Ego Holding LLC ("Super Ego Holding"), Floyd Inc.,

("Floyd"), Kordun Express Inc. ("Kordun"), Rocket Expediting LLC ("Rocket"), Jordan

Holdings, Inc. d/b/a JHI Transport, ("Jordan"), Haidar Dawood LLC ("Haidar"), Rex

Trucking Inc. ("Rex"); and Aleksandar Mimic ("Mimic") for breach of contract, fraud, civil

conspiracy, violations of the Truth In Leasing Act ("TILA"), 49 U.S.C. § 14704(a)(2),

violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b); violations of the

Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/10a,

and violations of the Illinois Wage Payment and Collections Act ("IWPCA"), 820 ILCS 115/9. Plaintiffs bring their claims as a putative class and collective action pursuant to Fed. R. Civ. P. 23(b)(3).

### Introduction

1.       Defendants are an affiliated group of transportation carriers, leasing companies, and holding companies that are owned and operated in common. Super Ego Holding maintains common ownership and control over all the other Defendants. Floyd, Kordun, Jordan, Rocket, and Haidar (together, "Carrier Defendants") are transportation carriers licensed with the DOT and Federal Motor Carrier Safety Administration ("FMCSA"). Rex leases equipment to the other affiliated entities and the drivers of those entities. Mimic is the president or manager for multiple Defendants. These Defendants have (1) comingled their businesses and operated interchangeably to illegally misuse their federal operating authorities; and (2) commonly shared drivers, dispatchers, and other staff, in contravention of the drivers' contracts, shipping documents, and federal regulations.

2.       Defendants conspired to engage in a widespread, longstanding scheme to defraud owner-operators/lessors with whom they contract to steal part of their compensation. Plaintiffs worked for Defendants as owner-operator/lessors, using trucks they leased to transport loads in interstate commerce. Defendants executed agreements with Plaintiffs to lease their equipment ("Lease Agreements") and pay them 88% of the price (or "rate") of each load they transported for Defendants. Instead of paying the contractually promised amounts, Defendants wrongfully conspired to secretly alter the third-party brokers' load confirmation documents to reduce the actual rate (price) of each load, shared only the altered versions of the load confirmation documents with Plaintiffs, and then paid Plaintiffs only 88% of the fraudulently reduced load price. Defendants also

breached their Lease Agreements with Plaintiffs and violated the ICFA and the IWPCA by engaging in this illegal practice.

3. Additionally, Defendants violated Plaintiffs' rights under the Truth in Leasing Act ("TILA"), 49 U.S.C. § 14704(a)(2). The TILA governs the terms and conditions under which owner- operator truckers lease equipment to federally authorized motor carriers that transport freight in interstate commerce. *Id.* TILA regulations require the motor carrier's equipment lease to disclose all expenses that the carrier will "charge back to the operator" and all escrow payments that the owner-operator will make to the motor carrier. 49 C.F.R. § 376.12(h) & (k). The regulations also require the lease to "clearly state[]," in writing, the amount that the motor carrier will pay the owner-operator as compensation. *Id*. § 376.12(d). If an owner-operator's compensation is based on a percentage of the gross receipts of the load, then the carrier must provide the owner operator with copies of the original brokers' load confirmations sheets for each load at or before the time of settlement. *Id*. § 376.12(g). Finally, the carrier must abide by its lease agreement with the owner operator. *Id*. (intro paragraph).

4. Defendants violated the TILA including by not paying interest on their escrow deductions, not returning their escrow in full, overcharging Plaintiffs for fuel, not providing Plaintiffs with the original brokers' load confirmation sheets, and not paying owner-operators at the percentage rate promised in their Lease Agreements.

5. Defendants violated the FLSA by frequently paying some of the Plaintiffs less than the federal minimum wage of $7.25 per hour or withholding their paychecks altogether, resulting in no payment in certain workweeks. Plaintiffs were employees of Defendants for the purposes of the FLSA.

6.     On information and belief, Defendants' foregoing illegal practices are widespread and universally applied to each individual and business with whom Defendants have contracted to transport goods. Defendants have also executed substantively identical Lease Agreements with thousands of other individuals and businesses. Plaintiffs bring this action on behalf of themselves and all others similarly situated to seek monetary damages and declaratory, injunctive, and other equitable relief.

**Parties**

7.     Plaintiff Larry Atkinson, a Georgia resident, is an interstate truck driver with seven years of experience in the transportation industry. He signed a Lease Agreement with Rocket. He has a CDL Class A license and worked for Defendants, under their direction and control from December 2021 to June 2022 using equipment that Rex leased to him.

8.     Plaintiff Eugene Walker, a Georgia resident, is an interstate truck driver with over 35 years of experience in the transportation industry. He signed a Lease Agreement with Rocket. He has a CDL Class A license and worked for Defendants, under their direction and control, from July 2021 to August 2022, using equipment that Rex leased to him.

9.     Plaintiff Jason Greene, a Tennessee resident, is an interstate truck driver with 23 years of experience in the transportation industry. He signed a Lease Agreement with Rocket. He has a CDL Class A license and worked for Defendants, under their direction and control, from December 2021 to April of 2022, and then again from June to July 2022, using equipment that Rex leased to him.

10.    Plaintiff Giovanni Williams is a Georgia resident. He worked for Defendants, under their direction and control, from July to October or November 2021. He signed a Lease Agreement

4

with Rocket. Williams contracted with another driver to use equipment that Rex leased to him to transport goods for Defendants.

11.     Plaintiff Terrill Clay is an Illinois resident. He worked for Defendants under their direction and control for approximately six months in 2022, using equipment that Rex leased to him. Clay signed a Lease Agreement with Haidar.

12.     Plaintiff Charles Cross is an Illinois resident. He worked for Defendants under their direction and control for approximately four weeks in August 2022, using equipment that Rex leased to him. Cross signed a Lease Agreement with Haidar.

13.     Defendant Super Ego Holding is an Illinois limited liability company with a principal office located at 621 IL Route 83, Suite 240, Cook County, Bensenville, IL 60106. Super Ego Holding employs or contracts with drivers to transport its customers' freight in interstate commerce through its subsidiaries and affiliates. The manager and registered agent of Super Ego Holding is Aleksandar Mimic.

14.     Defendant Floyd is an Illinois business corporation with a principal place of business in Cook County Illinois. Defendant Floyd is a federally regulated motor carrier engaged in providing transportationservices to the shipping public and is an "authorized carrier" within the meaning of 49 C.F.R. §376.2(a). The President and registered agent of Floyd is Aleksandar Mimic, with a registered address at 729 N. Rt. 83, Suite 324, Bensenville, IL 60106.

15.     Defendant Floyd employs or contracts with drivers to transport its customers' freight in interstate commerce. As part of its business, Floyd leases equipment from other related entities and owner-operators.

16.     Floyd is registered under Motor Carrier ("MC") number MC-977366 and US DOT # 2903977. According to the SAFER - FMCSA management information system, Floyd reported

that it operated 81 power units (semi-trucks) and 81 drivers and reported that it ran approximately 9.731 million miles in 2020.[1]

17.    Defendant Jordan is a corporation with an address at 1900 Polaris Parkway, Suite 450, Columbus, OH 43420. Jordan is a federally regulated motor carrier engaged in providing transportation services to the shipping public and is an "authorized carrier" within the meaning of 49 C.F.R. § 376.2(a).

18.    Jordan employs or contracts with drivers to transport its customers' freight in interstate commerce. As part of its business, Jordan leases equipment from other related entities and owner operators.

19.    Jordan is registered under MC-519274 and US DOT # 1351000. According to the SAFER – FMCSA management information system, Jordan reported that it operated 260 power units and 271 drivers. Jordan reported that it ran 100 miles in 2020.[2]

20.    Defendant Kordun is an Illinois business corporation with a principal place of business in Cook County Illinois. Kordun is a federally regulated motor carrier engaged in providing transportation services to the shipping public and is an "authorized carrier" within the meaning of 49 C.F.R. §376.2(a). The President and registered agent of Kordun is Biljana Mimic, with a registered office at 765 N Route 83 Suite 115 Bensenville, IL 60106.

---

[1] Floyd Company Snapshot, FMCSA-SAFER, https://safer.fmcsa.dot.gov/query.asp?searchtype=ANY&query_type=queryCarrierSnapshot&query_param=USDOT&query_string=2903977 (last visited Nov. 3, 2022).
[2] Jordan Company Snapshot, FMCSA-SAFER, https://safer.fmcsa.dot.gov/query.asp?searchtype=ANY&query_type=queryCarrierSnapshot&query_param=USDOT&query_string=1351000 (last visited Nov. 3, 2022).

21.     Defendant Kordun employs or contracts with drivers to transport its customers' freight in interstate commerce. As part of its business, Kordun leases equipment from other related entities or owner-operators.

22.     Kordun is registered under MC-594223 and US DOT # 1606904. According to the SAFER - FMCSA management information systems, Kordun reported that it operated 596 power units (semi-trucks) and 596 drivers. Further, Kordun reported that it ran approximately 13.76 million miles in 2020.[3]

23.     Defendant Rocket is an Ohio limited liability company with an address at 1520 Old Henderson Rd., Suite 100B, Columbus, OH 43220. Defendant Rocket is a federally regulated motor carrier engaged in providing transportation services to the shipping public and is an "authorized carrier" within the meaning of 49 C.F.R. § 376.2(a).

24.     Rocket contracts with drivers to transport its customers' freight in interstate commerce. As part of its business, Rocket leases equipment to or from other related entities and owner-operators.

25.     Rocket is registered under MC-807590 and US DOT # 2356464. According to the SAFER - FMCSA management information systems, Rocket reported that it operated 48 power units (semi-trucks) and 48 drivers, and reported that it ran 100,000 miles in 2020.[4]

26.     Defendant Haidar is an Ohio limited liability company with an address at 20 S 3rd Street, Suite 210, Columbus, OH 43215. Haidar is a federally regulated motor carrier engaged in

---

[3] Kordun Company Snapshot, FMCSA-SAFER,
https://safer.fmcsa.dot.gov/query.asp?searchtype=ANY&query_type=queryCarrierSnapshot&query_param=MC_MX&query_string=594223 (last visited Nov. 3, 2022).
[4] Rocket Company Snapshot, FMCSA-SAFER,
https://safer.fmcsa.dot.gov/query.asp?searchtype=ANY&query_type=queryCarrierSnapshot&query_param=USDOT&query_string=2356464 (last visited Nov. 3, 2022).

providing transportation services to the shipping public and is an "authorized carrier" within the meaning of 49 C.F.R. § 376.2(a).

27.     Haidar employs or contracts with drivers to transport its customers' freight in interstate commerce. As part of its business, Haidar leases equipment from other related entities or owner-operators.

28.     Haidar is registered under MC-888851 and US DOT # 2551243. According to the SAFER - FMCSA management information systems, Haidar reported that it operated 225 power units (semi-trucks) and 225 drivers. Haidar reported that it ran 30,000 miles in 2020.[5]

29.     Rex is an Illinois business corporation with a place of business at 205 W. Grand Avenue, Unit 123, Bensenville, DuPage County, IL 60106. Rex executed lease or lease-to-purchase contracts with Plaintiffs.

30.     Defendant Aleksandar Mimic is an individual with a registered office at 1517 N. Dee Rd., Park Ridge, IL 60068. Mimic is registered agent for multiple Defendants and operates multiple of the Defendants as president or manager.

## Jurisdiction and Venue

31.     The Court has subject matter jurisdiction over this action pursuant to the TILA, 49 U.S.C. § 14704.

32.     The Court also has diversity jurisdiction over this action under 28 U.S.C. § 1332(a)(1), and jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d).

---

[5] Haidar Company Snapshot, FMCSA-SAFER, https://safer.fmcsa.dot.gov/query.asp?searchtype=ANY&query_type=queryCarrierSnapshot&query_param=USDOT&query_string=2551243 (last visited Nov. 3, 2022).

33.    Venue is proper in this jurisdiction under 18 U.S.C. § 1965(a) and 28 U.S.C. §1391(a), (b), and (c) because a substantial part of the events and omissions giving rise to this action occurred in the Northern District of Illinois.

## TILA Legal Standards

34.    The TILA and its implementing regulations govern the terms and conditions under which owner-operator truckers lease equipment to federally authorized motor carriers that transport freight in interstate commerce. *See* 49 U.S.C. § 14102(a); 49 C.F.R. § 376.12. TILA regulations require the motor carrier's equipment lease to disclose, in writing, the amount that the motor carrier will pay the owner-operator as compensation. 49 C.F.R. § 376.12(d). The regulations also require that those leases disclose the details of any escrow withholdings and charge back items. *Id*. at § 376.12 (h), (k). When the lessor's revenue is based on a percentage of the gross revenue for a shipment, the lease must specify that the carrier will provide the lessor a copy of the rated freight bill, or any other documentation used for a shipment containing the same information, at or before the time of settlement. *Id*. at 376.12(g). Finally, the regulations require the motor carrier to adhere to the terms of the lease. *Id.* § 376.12 (introductory paragraph).

## Common Facts

35.    Plaintiffs and other drivers worked for Defendants as owner-operators for purposes of the TILA regulations. 49 C.F.R. § 376.2. They transported goods for Defendants with the trucks they leased from Rex by either driving the trucks themselves or contracting with another driver to drive the trucks.

36.    Plaintiffs each signed agreements with Rex to lease or lease-to-purchase semitrucks. The agreements with Rex provided that Plaintiffs would exclusively use those trucks to transport

goods for Carrier Defendants. They could not use the Rex semitrucks to drive for any other motor carriers.

37.     Plaintiffs then signed substantially identical Independent Contractor Agreements (hereinafter "Lease Agreements") with one of the Carrier Defendants to "lease" the trucks to that Carrier Defendant for the purpose of transporting goods. This was the lease required by 49 C.F.R. § 376.11.

38.     The Lease Agreements constitute "leases" under the TILA rules and are subject to their regulations. 49 C.F.R. § 376.2(e).

39.     Under the Lease Agreements, the Carrier Defendants, as the authorized carriers, hold the federal motor carrier operating authority needed to provide services for the transport of non-exempt goods in interstate commerce. Plaintiffs leased their equipment (with or without drivers) to Carrier Defendants for the purpose of transporting goods through interstate commerce under Carrier Defendants' licenses and permits.

40.     Although only one of the Carrier Defendants is listed on each of the Plaintiffs' Lease Agreements, Carrier Defendants operated interchangeably, all under the control of Super Ego. Defendants instructed Plaintiffs to deliver freight for Carrier Defendants other than the Carrier with whom they signed a Lease Agreement.

### A. Defendants Fraudulently Altered Load Confirmation Documents To Pay Plaintiffs Less Than The Rates Specified In Their Work Contracts.

41.     Plaintiffs each applied for jobs with Defendants in response to Super Ego job postings promising "88% of every load." Job postings that are substantially similar to the postings each of the Plaintiffs replied to are attached here as Exhibit A, at 1-2. Plaintiffs all relied on the promise in Super Ego's advertisements that they would receive 88% of the price of all loads they hauled when they decided to work for Defendants.

42.     Defendants' recruiters also promised Plaintiffs that they would retain 88% of the revenue from the loads they hauled for Defendants. For instance, Tamara Todorovic Ristic, one of Defendants' recruiters, sent an email to Plaintiffs Williams and Atkinson before they started working for Defendants. The email stated, "Dispatch and account fee is 12% of each load we book for you which covers office expenses and payroll. So you get 88% of the load." Ex. B, Recruiter Emails. Williams and Atkinson relied on the email from Ristic promising to pay them 88% of the price of the load when deciding whether to work for Defendants.

43.     Prior to executing contracts with Carrier Defendants, Plaintiffs each spoke with, or received an email or text messages, from a recruiter for Defendants who promised they would pay Plaintiffs 88% of each load they hauled for Defendants.

44.     Carrier Defendants contracted with Plaintiffs and Class members through Lease Agreements substantially identical to the one attached here as Exhibit C.

45.     In the Lease Agreements, Carrier Defendants promised to pay Plaintiffs 88% of the gross receipts for each load.

46.     The Lease Agreements all state, "CARRIER agrees to pay 88% of load pay offered…" Ex. C.

47.     Similarly, Plaintiffs signed lease to purchase agreements with Rex, substantially identical to the one attached here as Exhibit D, which state, "Lessee shall pay to Lessor 12% commission on all loads as offered to Lessee under this agreement, and as a working contractor at Lessor's Motor Carrier. . ."

48.     In the transportation industry, paying a driver based on a "percentage of the load" means paying a driver a percentage of the total price the carrier's customers pay the carrier to transport the load.

49.     Paying based on a percentage of the price (the gross revenue the carrier receives for a load), is the trucking industry's dominant model of compensating owner-operators who lease their trucks. As of 2021, three out of every four leased owner operators were paid based on a percentage of the carrier's revenue for each load, as opposed to other payment methods such as hourly and per mile.[6]

50.     Notwithstanding the fact that their Lease Agreements were with a single Carrier Defendant, Plaintiffs performed deliveries for multiple Carrier Defendants.

51.     Defendants lied and under-reported the load price (or "rate") of Plaintiffs' loads in Plaintiffs' pay statements and in the falsified brokers' load confirmation sheets they gave to Plaintiffs.

52.     When Defendants received a load confirmation sheet from a broker, Defendants electronically altered the document to lower the stated price of the load and forwarded the fake load confirmation sheet to the driver. The altered documents were on the original third-party broker's letterhead. That way, the owner operators believed the load price was less than the price Defendants' customers were actually paying them to transport the load.

53.     Defendants directly pocketed the portion of gross receipts they concealed from each driver and paid drivers their promised portion of 88% on the lower, underreported amount.

54.     For example, on February 28, 2022 Atkinson received a secretly altered load confirmation between Defendant Floyd and broker C.H. Robinson by email from Defendants' dispatcher Dylan Ristic for a load to pick up on February 28, 2022, and drop off on March 4, 2022.

---

[6] Driver compensation, part 3: Percentage is king for leased owner-operators, long after the rise of miles post-deregulation, OVERDRIVE (July 21, 2021) https://www.overdriveonline.com/business/article/15066619/compensation-percentage-pay-dominates-among-ownerops.

The falsified load confirmation stated that the price of the load was $3,500. Ex. E, Original and Fraudulent Load Confirmations, at 5. Later, on June 2, 2022, Atkinson received a copy of the unaltered load confirmation from C.H. Robinson, which stated that the load price was $4,800. *Id.* at 2. Defendants paid Atkinson only 88% of the reduced load price of $3,500. Atkinson relied on the falsified load confirmation to his detriment. He would not have agreed to take the load for $3,500 if he knew the shipper was actually paying Defendants $4,800 to transport the load.

55. On December 8, 2021, Atkinson also received a secretly altered load confirmation sheet between Defendant Rocket and broker C2 Freight Resources, Inc by email from dispatcher Dylan Ristic for a load to pick up December 9, 2021 and drop off December 10, 2021. The falsified load confirmation stated that the price of the load was $2,000. Ex. F, 3. Later, on June 2, 2022, Atkinson received a copy of the unaltered load confirmation from C2 Freight, which stated that the load price was $2,700. *Id.* at 1. Atkinson relied on the falsified load confirmation to his detriment. He would not have agreed to take the load for $2,000 if he knew the shipper was actually paying Defendants $2,700 to transport the load.

56. Atkinson first discovered that Defendants altered the load confirmation documents in or around June of 2022 because he directly called the broker of a shipment and asked for a copy of the load confirmation sheet. When the broker sent him the original load confirmation, it listed a different load price than the load confirmation he later received from Defendants.

57. Atkinson repeatedly inquired by phone about the discrepancies with Defendants' dispatchers Dylan Ristic, Novak Wolf, and Izzy Jokic, and the dispatchers' manager Mitch. The dispatchers did not admit that Super Ego had altered the load confirmation sheets. Instead, they lied and said that the broker had made a "mistake" on the load price. Atkinson relied to his detriment on dispatchers' assertions that it was not Defendant's regular practice to alter load confirmation

sheets. As a result, he continued accepting loads from Defendants only because he believed that the prices listed on the load confirmation sheets were the actual prices of the loads.

58.     Walker first discovered that Defendants had altered a load confirmation document in September 2021. A broker gave Walker an original load confirmation sheet, which listed a higher gross receipt than the fraudulent load confirmation sheet he received from Defendants for the same load.

59.     After making the discovery, Walker inquired by phone about the fraudulent load confirmation sheet with Aneta Smileska, one of Defendants' dispatchers. The dispatcher did not admit that Defendants were altering load confirmation sheets. Instead, she lied and said there had been a mistake. Walker relied to his detriment on the dispatcher's assertion that it was not Defendants' regular practice to alter load confirmation sheets. As a result, he continued accepting loads from Defendants because he believed that the prices listed on the load confirmation sheets were the actual prices of the loads.

60.     Walker later received a fraudulent load confirmation sheet from Rocket stating that the price of the load was $1,700 for a load he was to pick up on March 9, 2022 and drop off on March 10, 2022. Ex. G, 5. After Walker delivered the load, the broker gave him the actual load confirmation sheet, which showed that the load price was $2,050. *Id*. at 1.  Rocket paid him 88% of the $1,700 amount, rather than 88% of the actual load price. Walker relied on the falsified load confirmation to his detriment. He would not have agreed to take the load for $1,700 if he knew the shipper was actually paying Defendants $2,050 to transport the load.

61.     Greene received a fraudulent load confirmation sheet between Floyd and broker Nolan Transportation Group, LLC falsely stating that the total load price was $1,500 for a load to pick up on December 22, 2021 and drop off on December 27, 2021. Ex. H, 1. The actual load

confirmation sheet that Nolan Transportation Group, LLC provided to Defendants showed that true the load price was $2,150. *Id*. at 3. Floyd paid Greene 88% of the $1,500 amount, rather than 88% of the actual load price. Green relied on the falsified load confirmation to his detriment. He would not have agreed to take the load for $1,500 if he knew the shipper was actually paying Defendants $2,150 to transport the load.

62.     Greene inquired with one of Defendants' dispatchers when a broker disclosed information about Defendants' secretly altered load confirmation sheets. The dispatcher lied and said that Defendants had not altered any load confirmation sheets. Greene relied to his detriment on the dispatcher's assertion that it was not Defendants' regular practice to alter load confirmation sheets. As a result, he kept working for Defendants only because he believed that the prices listed on the load confirmation sheets were the actual prices of the loads.

63.     On August 3, 2021, Williams received a fraudulent load confirmation sheet between Kordun and the broker CAP Logistics by email from Andrew Marsh, one of Defendants' dispatchers. The false load confirmation falsely stated that the total rate for a August 7, 2021 delivery was $900. Ex. I, 1. On August 9, 2021, Williams received the unaltered load confirmation from the broker showing that the actual load price was $1,975. *Id.* at 3. Defendants also lied and told Williams that the rate for a load his driver transported from Los Angeles to Texas was $3,500. Williams later learned that Defendants were paid $5,000 for the load. Williams relied on the fake load confirmations to his detriment. He would not have agreed to haul the loads for $900 and $3,500 if he knew that the shippers were actually paying Defendants $1,975 and $5,000, respectively, to transport the loads.

64.     Plaintiffs have called multiple brokers on over fifty loads, and on each occasion the broker has confirmed that the load price reflected on the load confirmation sheet that the Defendants

sent to the Plaintiffs were false. Defendants secretly reduced the rate on the third-party brokers' load confirmation sheets to make Plaintiffs believe they were being paid correctly.

65.     Plaintiffs relied on Defendants' representations in the falsified load confirmation sheets believing that the falsified rates reflected the true amounts that brokers paid Defendants for the loads.

66.     Defendants intentionally lied about the rates of Plaintiffs' loads in order to convince Plaintiffs to haul freight at a cheaper price than Defendants otherwise would have had to pay to them. By falsely informing Plaintiffs that customers agreed to pay less money than they really agreed to pay for the loads, Defendants convinced Plaintiffs to haul the loads under the mistaken belief that the prices represented true market rates.

67.     Plaintiffs executed their Lease Agreements with Carriers on the belief that Carriers would pay them 88% of the actual price that Carriers received for the loads.

68.     Carriers violated the TILA rules by not adhering to the terms of its lease agreement. 49 C.F.R. § 376.12 (intro paragraph).

69.     During the past five years alone, Defendants have collectively contracted with more than 1,000 lessors/owner-operators to provide transportation service for their clients.

70.     On information and belief, Carriers Defendants executed substantively identical Lease Agreements with more than 1,000 drivers.

71.     Defendants engaged in a regular practice of secretly altering their load confirmation sheets for all lessors/owner-operators with whom they contract to falsify the load price, and then paying those lessors/owner-operators a percentage of the lower, secretly altered load price.

72.     Defendants refused to provide Plaintiff Cross with the original brokers' load confirmation sheets. Instead, they provided "dispatch sheets" on their own letterhead listing what

they claimed to be the price of the load. The dispatch sheets give no indication that the listed load prices are anything other than the actual load prices that the brokers paid Defendants for hauling the loads.

**B. Plaintiffs Were Employees For The Purposes Of The FLSA and IWPCA**

73. Plaintiffs operated their semitrucks under Defendants' direction and control.[7]

74. Defendants dictated the loads Plaintiffs hauled. Plaintiffs were not permitted to negotiate or even choose their own loads by reaching out to brokers of loads on the "load boards," which are online marketplaces of available loads. Defendants instructed brokers and their owner-operators not to have direct contact with each other.

75. Defendants required Plaintiffs to follow numerous company rules and procedures. *See* Ex. C, Rules of Conduct, 9-10.

76. The only way Plaintiffs could make money while working for Defendants was to accept the loads that Defendants offered, and to say yes to as many loads as possible, regardless of whether the loads were desirable. Defendants also required Plaintiffs to follow their direction on specifics including the routes and time and location of pickups and drop offs.

77. Plaintiffs were not even permitted to choose the geographic destination of their loads. They were required to haul the loads Defendants chose for them. They could not, for instance, only take loads going to or coming from their home state, or only take loads within a certain region of the country.

78. Defendants tracked Plaintiffs' locations using GPS and electronic logging devices (ELDs), which Defendants owned, and which Defendants required Plaintiffs to keep in their trucks.

---

[7] Williams, whose subcontractor operated the leased semitruck, operated under Defendants' direction and control as stated herein.

79.     Plaintiffs' contract terms were for 12 months, and automatically renewed for one year absent 30 days' written notice by either of the parties. Ex. C, 1.

80.     Plaintiffs had no independent opportunity for profit or loss. Defendants required Plaintiffs to exclusively haul loads offered by their dispatch team. Plaintiffs could not independently negotiate loads from the "load boards," the online marketplaces that lists prices for available loads, with third parties.

81.     Defendants controlled the equipment Plaintiffs used to do their work. All Plaintiffs entered into lease purchase agreements to lease a semi-truck from Rex for a weekly leasing fee. The Rex leasing agreement required Plaintiffs to exclusively haul loads for one of the Carrier Defendants. The weekly lease payments were deducted from Plaintiffs' settlements. Plaintiffs were required to put less than $5,000 down for their trucks. Walker even received his truck for no money down. Defendants told Walker that anyone he recruited to work for them would also receive truck leases for no money down.

82.     Super Ego advertises that owner operators can lease trucks for no money down. Ex. A, Super Ego Job Postings, 5.

83.     The Rex equipment lease provided that Rex could declare the lease in default and trigger extreme financial penalties if Plaintiffs missed a lease payment, or made a partial lease payment, and did not cure within 10 days. In the event of a default, Rex could repossess the semitruck, and declare that all payments due over the life of the lease were immediately due. Ex. D, 6.

84.     Defendants required Plaintiffs to provide monthly vehicle maintenance reports. If Plaintiffs failed to provide monthly vehicle maintenance reports, the Lease Agreements provided

that Defendants could place their semi-trucks "out of service" and charge them between $500 and $1,500 as a penalty. Ex. C, at 5.

85.     According to the Lease Agreements, Defendants also fined Plaintiffs between $1,000 and $2,000 for any speeding violation over 10 mph over the posted speed limit, on top of the penalties Plaintiffs would have to pay the particular jurisdiction for the speeding violation. *Id*.

86.     Defendants' Lease Agreements with Plaintiffs required Plaintiffs to haul loads exclusively for Defendants while they were leasing trucks from Rex. Plaintiffs could haul loads for another carrier only if they owned their own trucks, which none of them did. Even then, the Lease Agreement provides that Plaintiffs would need Defendants' approval and could only work for other carriers for a 30-day period. Ex. C, at 3.

87.     Plaintiffs did not employ a specialized skill, and their work was integral to the Defendants' business. Plaintiffs are semitruck drivers who operated semitrucks for trucking companies.

## C.  Defendants Made Illegal Deductions From Plaintiffs' Compensation

88.     When Plaintiffs began working for Defendants, they traveled to Illinois to pick up their trucks and attend an orientation training about Defendants' company procedures.

89.     Plaintiffs regularly used Illinois roads to make pickups and drop offs in Illinois.

90.     During many weeks that Plaintiffs worked for the company, Defendants deducted significant amounts from Plaintiffs' wages or final compensation.

91.     Defendants deducted money from Plaintiffs' compensation for a so-called escrow account.

92.     Defendants deducted money from Plaintiffs' settlement statements for semitruck lease payments to Rex, trailer rentals, and cargo insurance.

93.     Defendants deducted money from Plaintiffs' settlements for all maintenance and repairs to the trucks Plaintiffs were leasing from Rex.

94.     Defendants deducted money from Plaintiffs' settlements for all fines and penalties incurred during the course of their work.

95.     Defendants did not pay interest on Plaintiffs' escrow accounts or return the escrow to Plaintiffs who terminated their employment with Defendants.

96.     Defendants deducted money from Plaintiffs' compensation for occupational accident insurance. The deductions for occupational accident insurance were not disclosed in Plaintiffs' Lease Agreements as a possible chargeback.

97.     If drivers elected to have one of the Defendants calculate and pay the drivers' IFTA (fuel taxes) on the drivers' behalf, then Defendants required drivers to use the company's fuel card. Although Plaintiffs signed their Lease Agreements with Carrier Defendants other than Floyd, Defendants issued Plaintiffs a fuel card from Floyd. Every week, Defendants reduced Plaintiffs' settlement payments by the fuel charges on their respective Floyd-issued fuel cards.

98.     Defendants negotiated rate discounts with multiple fuel stations, including Pilot and Loves. Defendants then required the Plaintiffs and other drivers to use Pilot and Loves fuel stations to purchase fuel.

99.     Despite having negotiated substantial discounts on the price of fuel, Defendants improperly charged Plaintiffs the non-discounted fuel price on their weekly settlement statements and retained the savings, thereby depriving the drivers of the rebate.

100.    The deductions that Defendants made from Plaintiffs' wages were not: (1) required by law; (2) for the benefit of the Plaintiffs and the other drivers; (3) in response to a valid wage

assignment or wage deduction order; or (4) made with the express written consent of the employees, given freely at the time the deductions were made.

101. Mimic was aware of and approved these illegal deductions from Plaintiffs' wages.

### D. Defendants Violated the FLSA By Paying Plaintiffs and the Class Less Than the Federal Minimum Wage.[8]

102. From November 7, 2019 to present, Defendants constituted an "enterprise" as that term is defined in the FLSA because they performed related activities (either through unified operation or common control) for a common business purpose. During the relevant times, Defendants engaged in well over $500,000 in annual sales or business.

103. Defendants failed to pay Plaintiffs the federal minimum wage for all work weeks, unlawfully reducing their pay below the minimum wage through deductions.

104. For example, Atkinson drove nearly 3000 miles—at least 50 hours—for Defendants from March 7-11, 2022. Defendants did not pay him any wages for the week. Ex. K, Atkinson Settlement Statement.

105. Walker drove at least 40 hours for Defendants during his last week working for Defendants in July, 2022. Defendants did not pay him any wages for the week.

106. Greene drove at least 70 hours during his last week working for Defendants in April 2022. Defendants did not pay Greene any wages for the week.

107. Cross drove for Defendants at least 60-75 hours per week for approximately four weeks during the month of August 2022. Super Ego did not pay him at all for his work. Cross transported five loads and drove approximately 2,400 miles for Defendants from August 1-6, 2022, and Defendants claimed that *he* owed *them* $4.43. Ex. L, Cross Settlement Statement.

---

[8] Plaintiffs' FLSA Consent Forms are attached as Group Exhibit J.

108.    Clay drove nearly 500 miles for Defendants on September 1-2, 2022, and Defendants did not pay Clay for his work, and claimed that Clay owed them $1,181.34 for expenses. Ex. M, Clay Settlement Statement.

109.    The deductions on Plaintiffs' pay statements were for their truck leases and expenses associated with transporting the loads and not for expenses for the benefit of the Plaintiffs.

110.    On information and belief, Mimic, as principal of Super Ego Holdings, had the power to hire and fire employees, determine the schedules and conditions of employment, and determine the rate and method of employee compensation.

**E.  Defendants' Joint Undertakings as Alter Egos**

111.    Super Ego Holding maintains ownership and control over Defendants Floyd, Kordun, Rocket, Rex, Haidiar, and Jordan and operates them as a single entity with unity of interest.

112.    Super Ego Holding also controls Rex and operates it with unity of interest with other Defendants and affiliated companies it controls. For instance, Ego Express LLC, an affiliated company, is listed as lessor, and Floyd is listed as registrant, of trucks that Rex purportedly leased to Plaintiffs. Super Ego Holdings advertised its rent-to-own program and advertised itself as the employing entity. Ex. A.

113.    Defendants comingled funds from different Defendant entities to pay Plaintiffs for their load deliveries.

114.    Carrier Defendants operate interchangeably. Even though Plaintiffs signed Lease Agreements to transport goods under Carrier Defendants' carrier licenses, they regularly delivered loads for other Carrier Defendants. Defendants' dispatchers instructed them to check in for pickups and deliveries under the names of Carrier Defendants other than those with whom they signed Lease Agreements.

115.    For instance, Walker's weekly settlement statements were sent to him under Rocket's name, and Walker's 1099 was issued by Floyd. Although Walker leased his truck from Rex, the truck was registered with the Illinois Secretary of State under Floyd, with Ego Express listed as the Lessor. Walker also regularly received altered load confirmation documents from Defendants listing different Carrier Defendants as the carrier for loads he transported, even though he was operating under Rocket's MC Number and DOT Number.

116.    Atkinson's weekly settlement statements were sent to him under Rocket's name, and his 1099 was issued by Floyd. Although Atkinson leased his truck from Rex, the truck was registered with the Illinois Secretary of State under Vladimir Ilic as the Registrant and Ego Express as the Lessor. Atkinson also regularly received altered load confirmation documents from Defendants listing different Carrier Defendants as the carrier for loads he transported, even though he was operating under Rocket's MC Number and DOT Number.

117.    Defendants instructed Atkinson and Walker to deliver freight for Rocket, Floyd, and Kordun, even though their Lease Agreements were with Rocket.

118.    Williams' weekly settlement statements were sent to him under Rocket's name. Williams also regularly received altered load confirmation documents from Defendants listing different Carrier Defendants as the carrier for loads he transported, even though his driver was operating under Rocket's MC Number and DOT Number.

119.    Defendants instructed Williams to have the driver he hired to deliver freight for Rocket and Kordun, even though his Lease Agreement was with Rocket.

120.    Greene's weekly settlement statements were sent to him under Rocket's name, and his 1099 was issued by Floyd. Although Greene leased his truck from Rex, the truck was registered with the Illinois Secretary of State under Floyd and with Ego Express registered as the Lessor.

Greene also regularly received altered load confirmation documents from Defendants listing different Carrier Defendants as the carrier for loads he transported, even though he was operating under Rocket's MC Number and DOT Number.

121.     Defendants instructed Greene to deliver freight for Rocket, Floyd, Kordun, and Jordan, even though his Lease Agreement was with Rocket.

122.     Cross's weekly settlement statements were sent to him under Rocket's name, even though he signed his Lease Agreement with Haidar. Defendants also instructed Cross to deliver freight for Haidar, Jordan, and Rocket, even though his Lease Agreement was with Haidar.

123.     Defendants instructed Terrill Clay to deliver freight for Haidar, Floyd, and Rocket, even though his Lease Agreement was with Haidar.

124.     Based upon a search of the "SAFER" system maintained by the FMCSA, Defendant Super Ego Holding is not registered as a broker nor Motor Carrier and has not reported operating any semi-trucks (also known as power units or tractor trailers).[9]

125.     Despite having no FMCSA and no DOT number allowing it to operate as an interstate carrier, Super Ego Holding' website claims that:

> "Super Ego Holding is a transportation company recognized throughout the USA as the **best choice for your transportation needs**, as well as a model employer.
>
> A privately-owned company, permanently investing in its employees and the latest-model equipment, whose top priority is the customer satisfaction, Super Ego Holding is now a transportation company with recognizable name and reputation." (emphasis in original). Ex. A, 4.

126.     Despite having no FMCSA and no DOT number allowing it to operate as an interstate carrier, Super Ego Holding publishes advertisements to hire drivers and owner-operators to transport goods. Ex. A, at 1-2.

---

[9] The "SAFER" database can be found at http://safer.fmcsa.dot.gov/CompanySnapshot.aspx.

127. When recruiting drivers, Super Ego staff or the staff of the related Carrier Defendants represent to the drivers that the various Defendants all operate together using the same employees under the Super Ego brand.

128. Super Ego picks up prospective drivers—for all Carrier Defendants—who fly to Chicago for orientation at the airport in a Super Ego branded charter bus and takes them to Super Ego headquarters for orientation.

129. In October 2022, Super Ego sent a text message blast to all its drivers and owner-operators working for its various carriers. The text message advised drivers of a new central email address where they could report complaints to Super Ego corporate, regardless of the Super Ego carrier with whom they were under contract.

130. Despite having no FMCSA nor DOT number allowing it to operate as an interstate carrier, when advertising in its recruiting postings, Defendant Super Ego claims that it has "Over 2800 trucks! And they are coming every day!" (Ex. A, 3) and that they pay drivers "88% of every load." *Id.* at 2.

131. Defendants commonly share drivers, dispatchers, and other administrative staff among the various businesses.

132. Despite having no FMCSA nor DOT number allowing it to operate as an interstate carrier, Super Ego Holding is co-branded with its affiliate carriers on hundreds, if not thousands of semi-trucks and also has its branding on the sides and back of its trailers. *See, e.g.*, Ex. N, Photos of Super Ego Trucks.

133. The logos of the Defendants Super Ego, Floyd, Kordun, and Rex, shown below, are also nearly identical in logo design, styling, and color scheme utilized.



<u>**Class and Collective Action Allegations**</u>

134.    Plaintiffs bring this action on behalf of themselves and the following classes of

similarly situated individuals or entities, defined as:

> Contract Class: All individuals or entities that signed equipment leases with
> any of the Defendants between August 5, 2012 and the present and were paid
> based on a percentage of the price of the load.

> Fraud Class: All individuals or entities that are members of the Contract
> Class and that received altered third party broker load confirmations from
> one of the Defendants between August 5, 2017 and the present.

> FLSA Class: All individuals who are in the Contract Class, who drove
> their own loads for Defendants, and who worked for one or more
> workweek during which they were paid less than $7.25 per hour for their
> work during the time period November 7, 2019 and the present.

> IWPCA Class: All individuals who are in the Contract Class and picked
> up or delivered loads for Defendants in Illinois.

135.    The Classes defined above satisfy the requirements of Rules 23(a) and 23(g).

a.    **Numerosity.** The Classes are so numerous that joinder of all members is

impracticable, and the disposition of their claims in a class action will provide

substantial benefits to both the parties and the Court. Since 2012, Defendants have collectively executed Lease Agreements with more than 1,000 owner-operator drivers.

b. **Commonality.** Common questions of law and fact predominate over individual issues affecting only individual class members. Questions of law and fact common to the Contract Class include, among others, the following:

    i. Whether Defendants paid interest on escrow funds as required by TILA regulations;

    ii. Whether Defendants charged owner-operator drivers for insurance without specifying the chargebacks in the drivers' equipment leases;

    iii. Whether Defendants unlawfully deducted the full price of fuel from drivers' settlements and retained the negotiated fuel discount;

    iv. Whether Defendants breached the terms of their equipment leases with owner-operator drivers by paying them less than the promised percentage of gross receipts on each load;

    v. Whether Defendants violated the TILA by failing to give Plaintiffs the original, unaltered brokers' load confirmation sheet;

    vi. Whether Defendants are jointly liable for all claims as alter egos;

    vii. Whether Defendants failed to return escrow funds due to the drivers.

Questions common to the Fraud Class include, but are not limited to:

    i. Whether Defendant(s) fraudulently represented to the Plaintiff and the Fraud Class that the gross receipts for a given load were lower than the amount actually collected by one or more Defendants;

    ii. Whether Defendants intentionally deceived Plaintiffs and the Fraud Class by lying to them about the gross receipts for loads they hauled and on which their compensation was based;

    iii. Whether Defendants intentionally deceived Plaintiffs and the Fraud Class by providing them with altered versions of the brokers' load confirmation sheets;

27

      iv.    Whether Plaintiffs and the Fraud Class relied on Defendants' false statements about the price of the load to their detriment.

Questions common to the FLSA Class include, but are not limited to:

      i.    Whether Plaintiffs and the FLSA Class were Defendants' employees for the purposes of the FLSA;

      ii.    Whether Defendants paid Plaintiffs and the FLSA Class less than the federal minimum wage of $7.25 per hour.

Questions common to the IWPCA Class include, but are not limited to:

      v.    Whether Defendants made deductions from Plaintiffs' and the IWPCA Class's wages without their written authorization at the time of the deduction;

      vi.    Whether Plaintiffs and the IWPCA Class were Defendants' employees for purposes of the IWPCA.

c. **Typicality**. Plaintiffs' claims are typical of the Classes' claims because they and all Class members were injured through Defendants' uniform misconduct. The claims of Plaintiffs and the Classes arise from the same operative facts and are based upon the same legal theories. There are no defenses unique to Plaintiffs.

d. **Adequacy.** Plaintiffs will fairly and adequately protect and represent the interests the Classes because (i) Plaintiffs have retained competent and experienced counsel that have the time, experience, and resources to litigate this case; (ii) Plaintiffs are members of the Classes they seek to represent, their claims are typical of the Classes, and they have suffered substantially similar injuries to those suffered by the rest of the Classes; (iii) Plaintiffs' interest in obtaining monetary relief for their Classes is consistent with and not antagonistic to the interests of the Classes.

136.    The proposed Classes satisfy the requirements of Fed. R. Civ. P. 23(b)(3).

a. **Predominance**. Common questions predominate over any individual questions because the important and prevalent issues in this case concern Defendants' conduct and its effects, which are common to the Classes. Individual issues are minor and may be nothing more than damages calculations pursuant to a formula.

b. **Superiority**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages suffered by Plaintiffs and the Classes, while collectively substantial, are relatively small per Class member compared to the burden and expense required to individually litigate their claims. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Both liability and damages can be determined in one class-wide proceeding.

<u>**Count I - Breach of Contract**</u>
**(By all Plaintiffs against all Defendants on behalf of the Contract Class)**

137.    Plaintiffs incorporate all prior allegations as if fully stated herein.

138.     Carrier Defendants contracted with Plaintiffs and Contract Class members through Lease Agreements substantially identical to the one attached here as Exhibit C.

139.    The Lease Agreements all state, "CARRIER agrees to pay 88% of load pay offered…" Ex. C.

140.    Further, Plaintiffs' lease to purchase agreements with Rex state, "Lessee shall pay to Lessor 12% commission on all loads as offered to Lessee under this agreement, and as a working contractor at Lessor's Motor Carrier. . ." Ex. D.

141.    The contract reflects that the drivers were to receive 88%, and Defendants were to retain 12%, of the actual freight rate that brokers or shippers paid Defendants for the drivers' line haul transportation services.

142.    Although Plaintiffs and the Contract Class members signed Lease Agreements with particular Carrier Defendants, Defendants operated as alter egos, rather than separate corporate entities, to breach Plaintiffs' and the Contract Class members' Lease Agreements.

143.    Defendants secretly altered load confirmation sheets to make the load prices appear lower than the prices that Defendants' customers actually paid to Defendants. Defendants then sent the altered load confirmation sheets to Plaintiffs and the Contract Class members to make them falsely believe that Defendants were paying them in accordance with their work contracts.

144.    Plaintiffs and the Contract Class members substantially performed all their obligations under their contracts with the Defendants.

145.    Defendants breached the contracts with Plaintiffs and the Contract Class members by not paying them based on the real price that Defendants' customers actually paid to Defendants.

146.    Defendants also breached the contracts by making unauthorized deductions from Plaintiffs' and the Contract Class members' wages and failing to return their escrow.

147.    Defendants, as the parties that received load confirmation sheets directly from the brokers, had the sole ability and discretion to provide Plaintiffs with copies of the load confirmation sheets without altering them. Defendants abused that discretion by secretly altering the load confirmation sheets to make it appear that the load price was lower than it actually was.

148.     Defendants breached their duty of good faith and fair dealing by secretly modifying the original load confirmation paperwork in order to artificially reduce the listed shipping prices and retaining the difference for Defendants' benefit.

**Count II - Truth in Leasing Act**
**(By all Plaintiffs against all Defendants on behalf of the Contract Class)**

149.     Plaintiffs incorporate all prior allegations as if fully stated herein.

150.     Carrier Defendants are motor carriers licensed with the U.S. Department of Transportation. Plaintiffs worked for Defendants as an owner-operator for purposes of TILA.

151.     Pursuant to the TILA regulations, Carrier Defendants signed equipment leases with Plaintiffs and the Contract Class members.

152.     Although Plaintiffs signed Lease Agreements with specific Carrier Defendants, Defendants operated as alter egos, rather than separate corporate entities, to breach Plaintiffs' Lease Agreements and violate the TILA.

153.     Under the TILA regulations, an authorized carrier may perform authorized transportation in leased equipment only if the written lease granting the use of the equipment meets the requirements of 49 C.F.R. § 376.12.

154.     Under the regulations, the required lease provisions must be "adhered to and performed by the authorized carrier." *Id.* § 376.12 (introductory paragraph). The TILA also requires that leases disclose all "chargebacks," or deductions from compensation. *Id.* at § 376.12(h). If a drivers' compensation is based on a percentage of the price of the load, then carriers must provide the driver with copies of the original brokers' load confirmation sheets at or before the time of settlement. *Id.* § 376.12(g). Finally, the regulations require the carrier to pay interest on the amounts that it holds in escrow. *Id.* § 376.12(k)(5).

155.     Defendants did not disclose the amounts of certain chargebacks on their Lease Agreements with Plaintiffs, including for occupational accident insurance, trailer rentals, and cargo insurance.

156.     Defendants never paid interest on the amounts they deducted in escrow from Plaintiffs' and the other owner-operator drivers' pay.

157.     Defendants required Plaintiffs to use their fuel cards to purchase gas at regular market price, despite the fact that Defendants had negotiated a hefty discount. Gas stations then reimbursed Defendants for the different between the market price and the discounted price, but Defendants charged Plaintiffs for the full price of gas. The Lease Agreements did not authorize Defendants to charge Plaintiffs more than the actual price of fuel that Plaintiffs used to operate Defendants' vehicles.

158.     In the Lease Agreements, Defendants agreed to pay Plaintiffs and the other owner-operator drivers a certain percentage of gross revenue for each load they hauled for Defendants.

159.     Defendants falsely represented the actual prices of the loads in order to pay Plaintiffs and the other owner-operator drivers less than the amount promised in their Lease Agreements.

160.     Defendants failed to provide Plaintiffs with copies of the original, unaltered brokers' load confirmations.

161.     Defendants did not adhere to the terms of the Lease Agreements.

162.     Under 49 U.S.C. §14704(a)(2), Defendants are liable to Plaintiffs and the Contract Class for the damages that they suffered on account of Defendants' regulatory violations.

### Count III- Illinois Consumer Fraud and Deceptive Business Practices Act
**(By all Plaintiffs against all Defendants on behalf of the Contract Class)**

163.     Plaintiffs incorporate all prior allegations as if fully stated herein.

32

164.    Defendants advertised to the general public that they would pay owner-operators 88% of each load delivery.

165.    Defendants' recruiters told Plaintiffs that they would "get 88% of the load" and Defendants would keep a "12% dispatch and accounting fee." Ex. B, Recruiter Email.

166.    Defendants deceived Plaintiffs and the Contract Class by offering them a load for the price of a 12% dispatch and accounting fee, and then secretly retaining more than 12% of the load.

167.    Defendant deceived Plaintiffs by lying and under-reporting the gross revenues Defendants received for loads hauled by Plaintiffs and the Contract Class. At times, Defendants deceived Plaintiffs by sending them altered load confirmation sheets from third party freight brokers.

168.    Defendants intended that Plaintiffs rely on their reports of the gross revenues so that Defendants could pay Plaintiffs and the Contract Class less than the amounts they were owed pursuant to their equipment leases. Plaintiffs and the Contract Class relied on these misrepresentations.

169.    Defendants engaged in deceptive and unfair practices in the conduct of their business, in violation of 815 ILCS §§ 505/2, 510/2(a), by engaging in the acts and practices alleged herein.

170.    Defendants' unfair business practices violated established public policy, including the TILA.

171.    Defendants' unfair and deceptive practices and acts were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and the Contract Class.

172.     Defendants' deceptive business practices happened in the course of trade or commerce.

173.     Defendants' deception and unfair business practices proximately caused Plaintiffs and the Contract Class to be paid less than the amounts they were owed pursuant to their Lease Agreements.

174.     Defendants' deceptive acts were designed to enrich Defendants without regard to the effect on Plaintiffs and the Contract Class.

**<u>Count IV – Civil Conspiracy</u>**
**(By all Plaintiffs against all Defendants on behalf of the Contract Class)**

175.     Plaintiffs incorporate all prior allegations as if fully stated herein.

176.     Defendants knowingly and willfully conspired and agreed among themselves to breach contracts and violate the requirements within TILA and ICFA.

177.     In furtherance of said conspiracy and agreement, Defendants engaged in misleading representations, omissions and concealment of facts, acts of coverup, and consumer fraud—all calculated to violate Plaintiffs and the Contract Class's contracts and rights, and secretly deprive them of the compensation they were owed.

178.     All of the actions of Defendants set forth in the preceding paragraphs were in violation of the rights of Plaintiffs and the Contract Class and committed in furtherance of the aforementioned conspiracies and agreements.

179.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Contract Class were deprived of compensation due and owing to them under their Lease Agreements. Plaintiffs and the Contract Class have suffered ascertainable losses of money and property and sustained monetary damages.

180.     Defendants carried out these acts with willful and conscious disregard for Plaintiffs'

and the Contract Class's rights with the intention of depriving Plaintiffs and the Contract Class of

money owned to them or otherwise causing injury, and subjected Plaintiffs and the Contract Class

to unjust hardship so as to justify an award of exemplary and punitive damages.

**Count V – Common Law Fraud**
**(By Plaintiffs Atkinson, Greene, Walker, and Williams against all Defendants on behalf of**
**the Fraud Class)**

181.     Plaintiffs incorporate all prior allegations as if fully stated herein.

182.     Defendants made numerous false statements to Plaintiffs and the Fraud Class

concerning the actual freight rates, or prices of the loads, that Defendants' customers paid

Defendants for drivers' deliveries.

183.     Defendants altered load confirmation sheets to make the load prices appear lower

than the prices that Defendants' customers actually paid to Defendants.

184.     Defendants then sent the fraudulent load confirmation sheets to Plaintiffs and the

Fraud Class to make them falsely believe that Defendants were paying them in accordance with

their work contracts.

185.     Defendants knowingly provided Plaintiffs and the Fraud Class with falsified load

confirmations.

186.     Plaintiffs and the Fraud Class had no reason to question the authenticity of the

fraudulently modified load confirmation sheets.

187.     For example, Defendants carefully altered the load confirmations to be virtually

identical in appearance to the brokers' original load confirmations, and the load confirmations

generally were on the broker's original letter head or otherwise bore the given issuing broker's logo.

188.    Plaintiffs and the Fraud Class reasonably and justifiably relied upon the false load confirmation sheets as though they were authentic.

189.    Plaintiffs and the Fraud Class incurred substantial damages in the form of underpayments for the services they offered because of Defendants' fraud.

190.    Defendants' conduct was fraudulent, egregious, and malicious and justifies an award of punitive damages.

**Count VI – Fair Labor Standards Act**
**(By Plaintiffs Atkinson, Walker, Greene, Cross, and Clay against all Defendants on behalf of the FLSA Class)**

191.    Plaintiffs incorporate all prior allegations as if fully stated herein.

192.    Defendants employed Plaintiffs and members of the FLSA Class.

193.    Defendants paid Plaintiffs less than the federal minimum wage of $7.25 per hour for numerous workweeks.

194.    Plaintiffs and members of the FLSA Class were not exempt from the federal minimum wage provisions of the FLSA.

195.    Defendants' violations were willful.

196.    On information and belief, Mimic had the authority to hire and fire Plaintiffs and members of the FLSA Class, supervised and controlled work schedules and conditions of Plaintiffs' and class members' employment, and determined the rate and method of Plaintiffs' compensation.

**Count VII – Illinois Wage Payment and Collections Act**
**(By Plaintiffs Atkinson, Greene, Cross, and Clay, against all Defendants on behalf of the IWPCA Class)**

197.    Plaintiffs incorporate all prior allegations as if fully stated herein.

198.    Plaintiffs Atkinson, Greene, Cross, and Clay were Defendants' employees for purposes of the IWPCA.

199.     Plaintiffs traveled to Illinois to pick up the trucks they leased from Defendants and attend orientation training on Defendants' company policies and procedures.

200.     Plaintiffs Atkinson, Greene, Cross, and Clay regularly used Illinois roadways to haul loads and picked up and dropped off shipments in Illinois.

201.     Plaintiffs Cross and Clay are Illinois residents.

202.     Defendants made deductions from Plaintiffs' and the IWPCA Class's wages for Defendants' benefit without Plaintiffs' written authorization at the time of those deductions.

203.     Defendants withheld final compensation from Plaintiffs and members of the IWPCA Class who terminated their employment with Defendants.

204.     Defendants refused to pay Plaintiffs and members of the IWPCA Class wages that they earned under their Lease Agreements.

205.     Mimic was aware of and approved the illegal deductions and withholdings.

## Prayer for Relief

Plaintiffs, individually and on behalf of the Classes, respectfully pray for the following relief:

    a.     An order certifying the Classes as defined above, appointing Plaintiffs' counsel as Class Counsel for all Classes, and appointing the following Plaintiffs as class representatives:

        1.     Contract Class: All Plaintiffs

        2.     Fraud Class: Plaintiffs Atkinson, Williams, Walker, and Greene

        3.     FLSA Class: Plaintiffs Atkinson, Walker, Greene, Cross, and Clay

        4.     IWPCA Class: Plaintiffs Atkinson, Greene, Cross, and Clay

b. An award of all economic, monetary, actual, consequential, compensatory, and punitive damages available under the law;

c. An award of restitution and disgorgement;

d. An award of all equitable relief requested herein;

e. An award of reasonable litigation expenses and attorneys' fees;

f. An award of pre- and post-judgment interest, to the extent allowable; and

g. Other further relief that the Court deems just and reasonable.

## Jury Demand

Plaintiffs demand trial by jury on all issues as to which a jury trial is available.

Date: November 7, 2022                    Respectfully submitted,

                                          /s/ Christopher J. Wilmes
                                          One of the Attorneys for the Plaintiffs

Christopher J. Wilmes
cwilmes@hsplegal.com
Caryn C. Lederer
clederer@hsplegal.com
Emily R. Brown
ebrown@hsplegal.com
Hughes Socol Piers Resnick & Dym
70 W. Madison St., Ste. 4000
Chicago, IL 60602
(312) 580-0100

James Stark
jstark@framewills.com
Stark Law Offices, LLC
110 W Roosevelt Rd.
Wheaton, IL 60187
(708) 228-1017