## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| LARRY ATKINSON, EUGENE WALKER, JASON GREENE, GIOVANNI WILLIAMS, CHARLES CROSS, and TERRILL CLAY, on behalf of themselves and others similarly situated, | Case No. 22-cv-04127 |
| Plaintiff, | |
| v. | |
| SUPER EGO HOLDING LLC; FLOYD, INC., KORDUN EXPRESS, INC., ROCKET EXPEDITING LLC, JORDAN HOLDINGS, INC. d/b/a/ JHI TRANSPORT; REX TRUCKING, INC., HAIDAR DAWOOD LLC; and ALEKSANDAR MIMIC | Hon. Martha Pacold |
| Defendants. | |

### PLAINTIFFS' RESPONSE TO DEFENDANTS'
### PARTIAL MOTION TO DISMISS

Christopher J. Wilmes
cwilmes@hsplegal.com
Caryn C. Lederer
clederer@hsplegal.com
Emily R. Brown
ebrown@hsplegal.com
Hughes Socol Piers Resnick & Dym
70 W. Madison St., Ste. 4000
Chicago, IL 60602
(312) 580-0100

James Stark
jstark@framewills.com
Stark Law Offices, LLC
110 W Roosevelt Rd.
Wheaton, IL 60187
(708) 228-1017

## INTRODUCTION

Plaintiffs are truck drivers who hauled freight for Defendants in interstate commerce.[1] Defendants are an affiliated group of transportation carriers, leasing companies, and holding companies that Defendant Super Ego Holdings owns and operates.

Plaintiffs applied for jobs with Defendants by responding to Super Ego's job posting promising them "88% of all loads." Defendants then had Plaintiffs all sign a contract promising to pay them "88% of the load pay offered" by the freight broker. Defendants did not pay Plaintiffs what they were owed, however, and affirmatively lied to Plaintiffs about how much the brokers offered to pay Defendants for Plaintiffs' loads. Defendants carried out the fraudulent scheme by altering and lowering the price of the load on the brokers' official rate confirmation sheets before forwarding the documents to Plaintiffs. Defendants' failure to pay Plaintiffs the amounts they were owed is a blatant breach of contract and violation of the Truth in Leasing Act ("TILA") regulations. 49 C.F.R. § 376.12 (intro paragraph) (requiring carrier to adhere to the terms of the equipment lease). Lying to Plaintiffs about the amounts that brokers offered to pay Defendants—and using fabricated documents to support the lies—is also outright fraud.

Additionally, Defendants' scheme involved misclassifying Plaintiffs as independent contractors and, in the process, violating their rights under the Fair Labor Standards Act ("FLSA") and Illinois Wage Payment & Collection Act ("IWPCA"). Plaintiffs' Amended Complaint sufficiently alleges FLSA and IWPCA claims against Defendants and Super Ego's owner and manager, Aleksander Mimic, in his individual capacity. Mimic exercised operational control over

---

[1] All Plaintiffs except Plaintiff Williams drove trucks for Defendants. Williams hired a driver to haul loads in the truck he leased from Rex.

Defendants and knowingly permitted Defendants to pay Plaintiffs less than the minimum wage and take illegal deductions from their pay. As a result, the Court should deny Defendants' motion.

## BACKGROUND

Defendants Floyd Inc., Kordun Express Inc. Rocket Expedited LLC, Jordan Holdings, and Haidar Dawood LLC ("Carrier Defendants") are federally licensed motor carriers that are owned and operated interchangeably by Super Ego. Carrier Defendants contract with shippers and buyers, through third-party freight brokers, to transport freight loads at a specified rate. First Amended Complaint (ECF No. 21) ("FAC") ¶ 39. Carrier Defendants then contract with drivers who own or lease their trucks to haul the actual loads under one of the Defendants' carrier licenses. *Id.* Alexander Mimic is the manager of Super Ego and president of Floyd. FAC ¶¶ 13, 14. He has the power to hire and fire employees, determine schedules and conditions of employment, and determine the rate and method of drivers' compensation. *Id.* ¶ 110. He also was aware of and approved the illegal wage deductions that are the subject of Plaintiffs' IWPCA claims. *Id.* ¶ 101.

Plaintiffs leased their trucks from Defendant Rex Trucking, Inc. ("Rex") through leases or lease-purchase agreements. *Id.* ¶ 36. Those agreements provided that Plaintiffs must exclusively use the leased trucks to haul loads for Carrier Defendants and pay Carrier Defendants 12% of the price of the load as a "commission" for Carrier Defendants' service in booking and negotiating the load. *Id.* ¶ 81. As is customary in the industry, Defendants split the load rate with drivers at an agreed-upon percentage. *Id.* ¶¶ 48-49. For Plaintiffs, the agreed-upon percentage was 88% of the price that the freight broker offered Defendants to haul the load. *Id.* ¶¶ 45-46.

Defendants memorialized this pay arrangement in their recruiting materials. Plaintiffs each applied to work for Defendants in response to Super Ego job postings promising "88% of every load." *Id.* ¶¶ 41, 140-41. Defendants' recruiters also promised Plaintiffs in writing that they would receive "88% of the load." *Id.* ¶ 42. Before Plaintiffs hauled a load, Defendants quoted a "rate" for

2

the load. *Id.* ¶¶ 51-53. Defendants' dispatchers represented this was the load rate that the broker offered to Defendants (88% of which would go to Plaintiffs). *Id.* Defendants then provided false and fraudulent rate confirmation sheets on the broker's letterhead purporting to show the price the broker agreed to pay Defendants for the load. *Id.* ¶ 52.

Defendants' conduct was fraudulent—and violated the contracts and the TILA—because the load prices dispatchers quoted to the Plaintiffs and the prices that Defendants wrote into broker rate confirmation sheets were false. *Id.* ¶ 52. Defendants made up the "load rates" to cheat the drivers out of pay. Defendants' dispatchers consistently told Plaintiffs the broker was offering less than it really was (for example, $3,500 instead of the actual $4,800 the broker agreed to pay), and then Defendants paid Plaintiffs 88% of the lesser amount and pocketed the difference as profit. *Id.* ¶¶ 51-53. Before filing this case, each Plaintiff later obtained the real broker rate confirmation sheet for at least one load they transported and confirmed the real broker rate confirmation sheet listed a higher load price than the price listed on the rate confirmation sheet that Defendants provided Plaintiff. *Id.* ¶¶ 54-63. Defendants literally made up lower prices and inserted them into an official broker rate confirmation sheet using Adobe Acrobat or similar software, fabricating the load prices to dupe the Plaintiffs and thousands of other drivers about the price of loads. *Id.* Plaintiffs relied to their detriment on the fake rate confirmations. *Id.* ¶¶ 54-63, 65.

Defendants also deducted money from each of Plaintiffs' settlement statements (paychecks) for a so-called escrow account and other charges. *Id.* ¶¶ 88-100. In violation of the TILA and IWPCA, Defendants retained Plaintiffs' entire escrow accounts when Plaintiffs terminated their employment and never provided any written justification for doing so. *Id.* ¶¶ 4, 95. Defendants also never paid interest on Plaintiffs' escrow account, as required by the TILA. *Id.* Defendants deducted other significant sums from Plaintiffs' pay without their written

3

authorization. *Id.* ¶¶ 88-100. Finally, Defendants secretly pocketed the fuel discount they received from fuel stations and charged Plaintiffs the non-discounted fuel price. *Id.* ¶¶ 97-99.

Defendants have not moved to dismiss Plaintiffs' common law fraud claims or FLSA and IWPCA claims against Defendants other than Mimic. Defendants also have not moved to dismiss Plaintiffs' TILA or breach of contract claims as they relate to Defendants not paying interest on escrow balances, overcharging Plaintiffs for the cost of fuel, and not disclosing chargebacks for occupational accident insurance, trailer rentals, and cargo insurance. FAC ¶¶ 155-157.

## ARGUMENT

**I.      The Contracts Required Defendants To Pay Plaintiffs 88% Of The Price The Freight Broker Offered To Pay Defendants For Each Load.**

Defendants argue that they did not promise and were not required to pay Plaintiffs 88% of the price that the freight broker offered to pay Defendants for each load. Defendants' twisted reading of Plaintiffs' contracts—as authorizing Defendants to pay Plaintiffs a percentage of whatever price Defendants made up for a load, regardless of the amount the broker offered to pay—is implausible and inconsistent with the text of the agreements. Plaintiffs signed materially identical agreements with one of the Carrier Defendants, that state:

> CARRIER agrees to pay 88% of load pay offered, minus applicable escrow deductions, cargo & liability insurance, cash advances. . . and any/all agreed upon damage/payments. FAC, Exhibit C at § I.a.

The most straightforward reading (here, the ordinary meaning) of the provision, is that the Carrier Defendant ("Carrier") agreed to pay Plaintiffs 88% of the load pay that the *broker* offered to pay Defendants for each load that Plaintiffs hauled.

Defendants' contrary proposed reading of the phrase is implausible and illogical. They claim that they can make up the price of each load and then pay the drivers 88% of whatever "load price" they make up. If Plaintiffs' pay were based on an arbitrary amount that Defendants and

Plaintiffs agreed on for each load, then it would make no sense for Defendants to then pay Plaintiffs 88% of that agreed-upon amount. Why would the Defendant offer Plaintiff 88% of $100 as a way to agree on a price of $88? The parties would simply agree to the $88 price directly. The fact that Defendants paid Plaintiffs based on a percentage or commission basis necessarily suggests that the parties agreed to split an amount received from some third party—i.e., the amount that the broker offered to pay Defendants for the load. Further, if the broker's price was irrelevant, then there was no reason for Defendants to send Plaintiffs false rate confirmation sheets on brokers' letterhead.

Defendants' interpretation of Plaintiffs' contracts with Rex is equally implausible. There, the Payment Terms for Leased Equipment specifies:

> Lessee [Plaintiffs] shall pay to Lessor [Defendants], 12% commission on all loads as offered to Lessee under this agreement, and as a working contractor at Lessor's Motor Carrier. FAC, Ex. D, 5 (ECF 21-4, 5).

The plain meaning of the contract shows that Rex offered the same pay as the Carrier Defendants. The commission to the Defendants was 12%, with 88% of the price of the load from the broker going to the driver. Because "commission" is not defined in Plaintiffs' contracts, courts may look to the dictionary definition to afford the word its plain, ordinary, meaning. *See Valley Forge Ins. Co. v. Swiderski Electronics, Inc*., 223 Ill. 2d 352, 366 (2006). In this context, the dictionary definition of "commission" refers to a percentage of an amount paid by some third party, i.e. the broker. Black's Law Dictionary defines "commission" as "a fee paid to an agent or employee for a particular transaction, usu. As a **percentage of the money received from the transaction**." Black's Law Dictionary (11th ed. 2019) (emphasis added). The Merriam-Webster Dictionary defines the word "commission" as "a fee paid to an agent or employee for transacting a piece of business or performing a service[,] especially: a percentage of the money **received from a total paid to the agent responsible for the business.**" Merriam-Webster Online Dictionary, https://www.merriam-webster.com (last accessed Dec. 7, 2022) (emphasis added). In other words,

a commission is a fee paid to an agent or employee by a third party. Here, the 12% commission is a percentage of the amount that the freight broker or shipper offered to pay Lessor [Defendants]. The remaining 88% is due to the Plaintiff drivers.

## II.    Plaintiffs' Contracts Are At Least Ambiguous And Thus Cannot Be Interpreted in Defendants' Favor On A Motion to Dismiss.

For the reasons discussed above, Defendants' interpretation of Plaintiffs' compensation provision is absurd and unreasonable. The plain meaning of the contractual language compels Plaintiffs' interpretation and obligates Defendants to pay the drivers 88% of the real load price. But even if the Court disagrees that the contract's plain meaning unambiguously compels Plaintiffs' interpretation, Defendants' proposed reading is certainly no more reasonable than Plaintiffs' reading, and the issue cannot be resolved on a motion to dismiss. The poorly drafted contracts do not expressly state whether "load pay offered" means load pay offered by Defendants to Plaintiffs, or load pay offered by the broker to Defendants. Accordingly, the provision is, at the very least, ambiguous on this point. *Cf. William Blair & Co., LLC v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 334 (1st Dist. 2005) ("A contract term is ambiguous if it can reasonably be interpreted in more than one way.").

If the provision is ambiguous, then the meaning of those provisions is necessarily a "question of fact," requiring consideration of extrinsic evidence, "which a court cannot properly determine on a motion to dismiss." *Nathan v. Morgan Stanley Renewable Dev. Fund, LLC*, No. 11 C 2231, 2012 WL 1886440, at *12 (N.D. Ill. May 22, 2012) (internal quotation marks omitted). When a court attempts to understand the intended meaning of an ambiguous contractual provision, "[a]ppropriate extrinsic evidence includes industry custom and the parties' course of dealing and course of performance." *NanoeXa Corp. v. Univ. of Chicago*, No. 10 C 7177, 2011 WL 1399264, at *3 (N.D. Ill. Apr. 13, 2011) (applying Illinois law).

6

Extrinsic evidence will overwhelmingly show the parties understood that Plaintiffs' compensation was based on a percentage of the price, or "load pay," brokers or shippers offered to pay Defendants. *See, e.g.* FAC ¶¶ 41-43, 48-49, 52-66. First, Defendants' argument is belied by their own conduct. Defendants would not send Plaintiffs the brokers' rate confirmation sheets unless the price of the load had a relationship to Plaintiffs' pay. Similarly, Defendants would not secretly alter the price on the rate confirmation sheets and try to create fraudulent business documents that falsify the broker's price. There was no reason to lie about the broker's price if the price was irrelevant to Plaintiffs' compensation. Defendants sent the broker rate confirmation sheets with fabricated prices on those rate confirmation sheets because Defendants promised to pay Plaintiffs a percentage of the broker's rate.

Also, before Plaintiffs signed their contracts, Defendants represented they would pay them a percentage of the price they received from the load. *Id.* ¶¶ 41-43. And in the course of the contract, Defendants continuously represented that they were paying Plaintiffs a percentage of the load price. Defendant continually sent Plaintiffs fraudulent rate confirmation sheets otherwise identical to the original on the brokers' form and letterhead with the lase price made up by the Defendants. Defendants even falsely reassured Plaintiffs that they were not altering rate confirmation sheets. *Id.* ¶¶ 57, 59, 62. Finally, to the extent any ambiguity remains after considering extrinsic evidence, basic principles of contract interpretation require the Court to construe any ambiguity against Defendants, as the party that drafted the contracts at issue. *See Morjal v. City of Chicago, Ill.*, No. 12 C 185, 2013 WL 2368062, at *2 (N.D. Ill. May 29, 2013).

III.    **If Defendants' Interpretation Of The Contracts is Accepted, The Contracts Still Violate TILA's Plain-Statement Requirement.**

The Interstate Commerce Commission promulgated the TILA regulations nearly forty years ago in response to Congressional complaints alleging abuses suffered by interstate owner-operator truck drivers. The stated purpose of the regulations is as follows:

> (1) To simplify existing and new regulations and to write them in understandable English; (2) to promote truth-in-leasing – a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts signed by both parties; (3) to eliminate or reduce opportunities for skimming and other illegal or inequitable practices; and (4) to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry.

Lease & Interchange of Vehicles, 131 M.C.C. 141 (I.C.C. 1979). In short, the regulations were promulgated to ensure that drivers were on clear notice of how they were to be paid and to prevent skimming by underhanded motor carriers.

To this end, the TILA regulations require that the "amount to be paid by the authorized carrier for equipment and driver's services shall be clearly stated on the face of the lease or in an addendum which is attached to the lease." 49 C.F.R. § 376.12(d). If Defendants truly contracted to pay Plaintiffs based on a percentage of some arbitrary amount other than the load rate, the contracts do not state that *clearly*. As a result, Plaintiffs have adequately alleged a violation of Section 376.12 of the TILA. *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Bulkmantic Transp. C*o., 503 F. Supp. 2d 961, 972 (N.D. Ill. 2007).

IV.    **Plaintiffs Sufficiently Alleged Breach Of Contract With Regard To Escrow And Other Deductions.**

Defendants next argue that Plaintiffs have not sufficiently alleged a breach of contract claim relating to unlawful deductions from their pay. The Court should reject this argument as well. Plaintiffs' contracts did not allow Defendants to charge Plaintiffs the full amount for fuel, and then secretly pocket the discount they received from charging stations, a practice Plaintiffs

8

allege Defendants consistently employed. *Id.* ¶¶ 97-99. The contracts stated that Plaintiffs were responsible for the cost of fuel. FAC. Exhibit C at § IV(3). However, they did not state that Defendants could deduct *more* than the actual cost of fuel from Plaintiffs' pay, and then pocket the difference. Plaintiffs' contracts also did not authorize Defendants to charge back the cost of occupational accident insurance, ELD enrollment fees, or trailer rental. FAC ¶¶ 96, 155 & Exhibit C, Exhibit L thereto. Plaintiffs have adequately alleged that Defendants breached the contracts by making these unauthorized deductions. Defendants do not argue otherwise.

Plaintiffs also sufficiently alleged that Defendants breached their contracts by improperly retaining Plaintiffs' escrow deposits. FAC ¶ 146. The contracts allowed Defendants to retain portions of Plaintiffs' escrow under certain circumstances: when Plaintiffs were assessed regulatory fees for failing to keep their equipment in operation for the full term of the agreement, and when Plaintiffs owed amounts for expenses that were Plaintiffs' responsibility to cover. FAC, Exhibit C at § I.a.3. Defendants have offered no such contractual justification for retaining each of the Plaintiffs' escrow accounts in full, and it will be their burden to establish why Plaintiffs were not entitled to receive the entire escrow balance. 49 C.F.R. § 376.12(k)(6). Further, Plaintiffs have alleged that they "substantially performed all their obligations under their contracts" which would include repaying any money they allegedly owed under the contract. FAC ¶ 144. Plaintiffs also represent that there was no contractual basis for Defendants to retain their escrow payments.[2]

---

[2] To the extent Plaintiffs did not make this sufficiently clear in their Amended Complaint, the Court may consider this additional fact in resolving the motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) ("We also must consider additional facts set forth in Phillips's district court brief and appellate briefs, so long as those facts are consistent with the pleadings.") (internal quotation omitted); *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Alternatively, Plaintiffs ask the Court to permit them to include this allegation in a Second Amended Complaint.

These violations of the parties' contract also violated TILA, which required Defendants to adhere to the terms of the equipment lease. 49 C.F.R. § 376.12 (introductory paragraph).

## V.     Plaintiffs Pled A Violation Of The Implied Duty Of Good Faith And Fair Dealing As Part of Their Breach of Contract Claim.

The implied duty of good faith and fair dealing is present in every contract in Illinois. *Northern Trust Co. v. VIII South Michigan Assoc.*, 276 Ill. App. 3d 355, 367 (1995). It requires that a party vested with contractual discretion exercise that discretion reasonably, not arbitrarily, or in a manner inconsistent with a party's reasonable expectations. *Id.* Plaintiffs have alleged that Defendants breached the covenant of good faith and fair dealing *as part of* their breach of contract claim. *See Solon v. Kaplan*, No. 00 C 2888, 2001 WL 123769, at *5 (N.D. Ill. Feb. 9, 2001) ("[T]o bring a claim for the breach of the implied covenant of good faith and fair dealing, a plaintiff must include it within a breach of contract claim."). If the breach of contract claim survives, the Court should not dismiss the good faith and fair dealing allegations that form part of that claim. *See BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief.").

## VI.    Plaintiffs Plead ICFA Claims Beyond A Mere Breach Of Contract.

Defendants ask the Court to dismiss Plaintiffs' ICFA claims, arguing that Plaintiffs' ICFA claims restate their breach of contract claims. They also assert Plaintiffs do not have standing to bring a deceptive practice ICFA claim because they are not "consumers" and because Defendants' actions were not aimed at the general marketplace.[3] The court should reject these arguments.

_____

[3] Plaintiffs alleged that Defendants' actions were both "unfair" and "deceptive" under the ICFA. However, Defendants did not address the unfair business practices theory in their motion to dismiss and thus have waived the challenge.

First, Plaintiffs have stated a solid ICFA claim separate and apart from the breach of contract. Their deceptive business practices claims are based on many of the same facts as their common law fraud claims, which Defendants have not moved to dismiss. Plaintiffs do not only allege that Defendants failed to pay them what they were owed. Rather, Plaintiffs allege Defendants affirmatively lied to them—using false and fabricated business documents—to deceive Plaintiffs repeatedly about the amounts they were owed. FAC ¶¶ 51- 64. Defendants' lies allowed the company to shield the fact that they were cheating Plaintiffs for months, or years. That is not a mere breach of contract; it is fraud. *See Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co*., 962 F.2d 628, 639 (7th Cir. 1992) ("[Defendant's] failure to deliver the document supports [the plaintiff's] contract claim, but it was the fact that [Defendant] lied about even having them, and about its business  experience, that supported the fraud claims and constituted a separate wrong."); *Stephens v. C&K Trucking, LLC*, No. 20 C 4305, 2021 WL 4978451, at *2 (N.D. Ill. May 17, 2021) (allegations that motor carrier, among other things, "lied about documentation requirements for receiving pay" and "provided contradictory and misleading statements in response to pay disputes" did not "merely describe Defendant's breach of its contractual promise" but described misrepresentations that "give rise to fraud").

Second, Plaintiffs are "consumers" under the statutory definition, which is to be liberally construed to effectuate its purpose. 815 ILCS 505/11a. The ICFA defines a "consumer" as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use." 815 ILCS 505/1(e). It also defines "merchandise" to include "services." *Id.* § 505/1(b). Plaintiffs contracted with Defendants for the provision of a service—namely, the finding and negotiating of loads with freight brokers and shippers—in exchange for 12% of the load rate that the freight broker or shipper offered to pay Defendants.  AC

¶¶ 42, 47, 165-66.[4] Nothing in the amended complaint suggests that Plaintiffs "resold" that service in any sense. That Plaintiffs contracted for the load-finding and negotiating service in the course of conducting an alleged business is irrelevant. *See Bank One Milwaukee v. Sanchez*, 336 Ill. App. 3d 319, 323 (2003) (holding that Act draws no distinction between natural persons and businesses). They are still consumers of that service.

Even if Plaintiffs were not consumers under the ICFA, Plaintiffs have sufficiently alleged an unlawful trade practice addressed to the market generally and one that implicates consumer protection concerns. Defendants regularly advertised their truck leases and owner-operator/driver opportunities on their website and social media—both of which were aimed at the general market. FAC ¶¶ 41, 82, 112, 126, 164. The advertisements falsely stated that Defendants would lease or lease-purchase trucks to drivers for no money down and would pay drivers "88% of the load" to haul loads. *Id*. ¶¶ 82, 112, 126, 164. Defendants lied about the price it would pay drivers to lease trucks from the company and disseminated those lies to the entire market of prospective truck drivers. *Id.* Courts are clear in holding that broadly publishing false statements about prices implicates consumer protection concerns. *See Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill. App. 3d 524, 534, 546 N.E.2d 33, 41 (1989) ("[W]here plaintiff has alleged defendant published false information about its prices for services, plaintiff has alleged conduct which implicates consumer-protection concerns.")

The use of fraudulent rate confirmation sheets to deceive drivers paying weekly sums towards a truck lease also implicate consumer protection concerns. *See Bank One Milwaukee*, 336 Ill. App. 3d at 324 (2003). In *Bank One Milwaukee*, a merchant allegedly forged a cosigner's

---

[4] Plaintiffs also leased their trucks from Rex, one of the Defendants' leasing companies, in exchange for the promise that Defendants would pay Plaintiffs 88% of the loads they hauled. *Id*. Leasing a truck is a classic consumer transaction.

signature on a loan document. The court had "little trouble" concluding that a merchant binding the plaintiff to a transaction through a fraudulent act "falls squarely within [the] scope" of consumer protection concerns. *Id*. Likewise, Defendants sent Plaintiffs fake rate confirmation sheets to induce Plaintiffs to keep making large weekly payments on their truck lease-purchase agreements. These misrepresentations made in connection with the lease-purchase of a truck clearly fall within the scope of the ICFA's consumer protection concerns.

**VII. Plaintiffs' Sufficiently Alleged That Aleksander Mimic Is Individually Liable.**

**1. Mimic is an employer under the FLSA.**

The "overwhelming weight of authority" is that "a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Solis v. Int'l Detective & Protective Serv.*, *Ltd*. 819 F. Supp. 2d 740, 748 (N.D. Ill. 2011). In assessing whether an individual is an "employer," the Court examines the "economic reality" of the working relationship. *Id*. "Relevant factors include whether the alleged employer: '(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records.'" *Deschepper v. Midwest Wine and Spirits, Inc.*, 84 F. Supp. 3d 767, 778 (N.D. Ill. 2015) (quoting *Nehmelman v. Penn Nat'l Gaming, Inc.*, 790 F. Supp. 2d 787, 795 (N.D. Ill. 2011)).

Rule 8 only requires Plaintiffs to provide enough detail to give the defendant fair notice of the claim and to show the claim is plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The rule does not require Plaintiffs to plead facts corresponding to each legal element required to prove their FLSA claims against Mimic. *See Chapman v. Yellow Cab Coop*., 875 F.3d 846, 848 (7th Cir. 2017) ("it is manifestly inappropriate for a district court to demand that complaints contain all legal elements (or factors) plus facts corresponding to each"). At this stage, Plaintiffs have stated

enough facts about Mimic's job duties and his role within the Defendants' structure to notify Mimic of plausible FLSA claims. Plaintiffs have alleged that Mimic is the manager of Super Ego Holdings and president of Floyd. FAC ¶¶ 13, 14. Plaintiffs have also alleged that Mimic had the authority to hire and fire Plaintiffs, supervised and controlled work schedules and conditions of Plaintiffs' employment, and determined the rate and method of Plaintiffs' compensation. *Id*. ¶ 196. In his LinkedIn page, Mimic describes himself as the "Founder and CEO" of Super Ego. Exhibit A, Aleksander Mimic LinkedIn Page.[5]

Courts regularly allow FLSA claims against CEOs and company presidents with managerial duties to proceed past the motion to dismiss phase and this case should be no different. *See Dawkins v. NR1 Transport, Inc.*, No. 20 C 4063, 2021 WL 4125086 (N.D. Ill. Sept. 8, 2021); *Cho v. Maru Restaurant, Inc.*, 194 F. Supp. 3d 700, 705 (N.D. Ill. 2016); *Deschepper v. Midwest Wine and Spirits, Inc*., 84 F. Supp. 3d 767 (N.D. Ill. 2015); *Roberts v. Apple Sauce Inc*., 945 F. Supp. 2d 995 (N.D. Ind. 2013) (defendant owned company and had day-to-day involvement in operations).

The case Defendants rely on in support of their argument, *Pfefferkorn v. Primesource Health Group, LLC*, is inconsistent with the case law cited above and with the Seventh Circuit's admonition that complaints need not plead facts in support of all legal elements of a claim. 2018 WL 828001, at *11 (N.D. Ill. Feb. 12, 2018). Though the Plaintiffs in *Pfefferkorn* alleged that the individual defendants, Elliott and King, supervised and controlled Plaintiffs employment, controlled the defendants' operations and labor and compensation policies, and acted directly in

---

[5] The Court may consider this additional material as elaborations on facts Plaintiffs alleged in the First Amended Complaint, and as an example of evidence Plaintiffs may put forth to support those facts. *See Geinosky*, 675 F.3d at 745 n. 1; *John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1007 (S.D. Ind. 2007).

Case: 1:22-cv-04127 Document #: 26 Filed: 12/21/22 Page 16 of 18 PageID #:303

the interest of defendants in relation to their employees, the Court held that the allegations were insufficient. *Id.* This holding simply cannot be squared with the Seventh Circuit's holdings regarding the amount of factual material that a plaintiff must allege in a complaint.

### 2. Mimic Is An Employer Under the IWPCA.

Under the IWPCA, an individual corporate officer is liable for a violation if he knowingly permits the illegal conduct. 820 ILCS 115/13. The Illinois Supreme Court has interpreted the IWPCA's "knowingly permit" requirement to extend even beyond the direct decisionmaker who signed off on the violation. Instead, "knowingly permit" also means "advise" or "consent" or "affect" or "consult" about the violation. *Zwick v. Inteliquent, Inc*., 83 F. Supp. 3d 804 (N.D. Ill. 2015), citing *Andrews v. Kowa Printing Corp.,* 217 Ill.2d 101 (2005); *Zicarelli v. Phillips*, No. 12 C 9602, 2013 WL 5387864 (N.D. Ill. Sept. 25, 2013); *Corso v. Suburban Bank & Trust Co.,* No. 03 C 9424, 2006 WL 418655 (N.D. Ill. Feb. 16, 2006). Plaintiffs have plausibly alleged that Mimic was the decisionmaker; that he knew about and approved the unauthorized deductions. FAC ¶ 205. That is all they must do at this stage.

Defendants base their arguments on *Gibbs v. ABT Electronics, Inc.*, No. 21 CV 6277, 2022 WL 16540182 (N.D. Ill. Oct. 28, 2022). There, the plaintiff brought an IWPCA claim alleging that Defendants deducted pay for meal breaks without his authorization and often required him to work through his meal breaks. *Id*. at *1. However, the plaintiff failed to allege that the individual defendant knew he was working through meal breaks or that the individual defendant was involved in the decision to not compensate him for meal breaks. Here, by contrast, Plaintiffs have alleged that Mimic knew about and approved the deductions that violated the IWPCA.

### CONCLUSION

For the reasons stated above, the Court should deny Defendants partial motion to dismiss in its entirety.

Date: December 21, 2022                          Respectfully submitted,

                                                 /s/ Christopher J. Wilmes
                                                 One of the Attorneys for the Plaintiffs

Christopher J. Wilmes
cwilmes@hsplegal.com
Caryn C. Lederer
clederer@hsplegal.com
Emily R. Brown
ebrown@hsplegal.com
Hughes Socol Piers Resnick & Dym
70 W. Madison St., Ste. 4000
Chicago, IL 60602
(312) 580-0100

James Stark
jstark@framewills.com
Stark Law Offices, LLC
110 W Roosevelt Rd.
Wheaton, IL 60187
(708) 228-1017

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that on December 21, 2022, I caused Plaintiffs' Response to Defendants' Partial Motion to Dismiss be Served Through the Court's CM/ECF system.

Charles Andrewscavage
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
30 West Monroe Street, Suite 1600
Chicago, IL 60603
Phone: 312-255-7200
Fax: 312-422-1224
candrewscavage@scopelitis.com

*Counsel for Defendants*


/s/ Christopher J. Wilmes

17